**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DELAWARE RIVERKEEPER**<br>**NETWORK** *et al.*,<br>　　　　　*Plaintiffs* | : <br> : <br> : <br> : | **CIVIL ACTION** |
| **v.** | : <br> : | |
| **PENNSYLVANIA DEPARTMENT OF**<br>**TRANSPORTATION** *et al.*,<br>　　　　　*Defendants* | : <br> : <br> : | **No. 18-4508** |

**M E M O R A N D U M**

PRATTER, J.                                                    AUGUST *20*, 2020

　　　Years of disputes flowing from this administrative review are far from water under the bridge. Rather, the waters remain troubled.[1]

　　　The Delaware Riverkeeper Network and the Delaware Riverkeeper, Maya van Rossum, challenge the Pennsylvania Department of Transportation's ("PennDOT") and the Federal Highway Administration's ("FHWA") issuance of a Final Categorical Exclusion Evaluation and a Final Individual Section 4(f) Evaluation approving a two-lane replacement of the Headquarters Road Bridge in Tinicum Township, Pennsylvania. Plaintiffs claim that Defendants' determinations were arbitrary and capricious under the National Environmental Policy Act ("NEPA") and Section 4(f) of the Department of Transportation Act, and they request that the Court remand the matter for consideration of rehabilitation and repair. The Project described in this Memorandum has been forestalled for years by the adversarial machinations between and among these parties.

　　　All parties move for summary judgment on the administrative record. For the reasons that follow, the Court grants the defense summary judgment motions on all claims.

---

[1]　　　SIMON & GARFUNKEL, BRIDGE OVER TROUBLED WATER (Columbia Records 1970).

**FACTUAL BACKGROUND**

## I.     The Bridge

The Headquarters Road Bridge ("the Bridge") crosses Tinicum Creek in Tinicum Township, Pennsylvania.  AR-27 at 12.  The western side of the Bridge is in Ottsville, Pennsylvania, and the eastern side is in Erwinna, Pennsylvania.  *Id.*  On the east side of the Bridge, there is a T-intersection with Sheep Hole Road to the north and Headquarters Road to the south. *Id.*

The Bridge consists of a concrete-encased, steel I-beam superstructure[2] supported on masonry piers and abutments.  *Id.*  The stone masonry piers, abutments, and wing walls are estimated to have been constructed in 1812.  *Id.*  The Bridge's superstructure was constructed a century later in 1919.  *Id.*  The Bridge's pipe rail was replaced with a steel beam guide rail attached to the concrete curbs in 1991.  *Id.*

The width of the Bridge is 18 feet.  *Id.*  When the Bridge was open to traffic, there was one 16-foot lane with no shoulders and a one-foot curb on each side.  *Id.*  In 2001, two-feet wide concrete barriers were installed along the curb lines, reducing the width of the travel lane to a minimum of 10 feet.  *Id.* at 14.

The Bridge posted a 19-ton weight restriction in 2006.  AR-14 at 51.  In 2010, this restriction was reduced to 10 tons.  *Id.*  The Bridge was closed to traffic in 2011 after a routine inspection disclosed a hole in the bridge deck.  AR-27 at 15.

---

[2]     This litigation prompts an extensive collection of bridge-related vocabulary.  The term "superstructure" simply refers to the portion of a bridge that is the span and receives the live load.  The "substructure," in contrast, refers to the bridge's abutment, piers, and other support structures.

## II.     Ridge Valley Rural Historic District

The Bridge is located in the Ridge Valley Rural Historic District ("the Historic District"), which comprises of approximately 575 acres of land in Tinicum Township.  AR-27 at 18.  The Historic District is listed in the National Register of Historic Places ("the National Register")[3] for its agriculture and architecture.  *Id.*  The Historic District contains 67 "contributing resources."[4] *Id.*  The Bridge and its adjoining tax parcels are contributing resources to the Historic District.  *Id.*

## III.    Tinicum Creek

Tinicum Creek is identified by the Pennsylvania Department of Environmental Protection ("PaDEP") as an exceptional value water under 25 Pa. Code § 93.  AR-26 at 21.  It is also classified by the National Park Service ("NPS") as a Federal Scenic River or Stream as part of the Lower Delaware National Wild and Scenic River.  *Id.* at 23.

The Wild and Scenic Rivers Act defines "outstandingly remarkable values" ("ORVs") as "the characteristics that make a river worthy of special protection, along with the river's free-flowing nature and water quality."  AR-26 at 23.  Tinicum Creek is part of the Lower Delaware River, which possesses all five ORVs: cultural, ecological, geological, recreational, and scenic. *Id.*  Tinicum Creek possess cultural, geological, and scenic ORVs.  *Id.*  Tinicum Creek is not considered a Pennsylvania Fish and Boat Commission-approved trout water or a Pennsylvania Wild Trout Water.  AR-27 at 14.  The Creek is also not considered a Pennsylvania Fish and Boat Commission Water Trail, and it is not listed in Keystone Canoeing, which is a guide to the canoeable waters in Eastern Pennsylvania.  *Id.*

---

[3]     The National Register is the official list of the United States' historic places deemed worthy of preservation.

[4]     A contributing resource is a building, site, structure, or object that adds to the historically significant value of the district.

The channel of Tinicum Creek that passes under the Bridge exhibits evidence of contraction scour,[5] and a scour hole[6] was observed adjacent to the Bridge's west abutment and northwest wing wall.  *Id.*  Grout bags were installed as a scour countermeasure, but only as a short-term solution.  *Id.*

## IV.    Process Prior to the Final Evaluations

Defendants collaborated throughout the Project's development process with stakeholders and agencies with jurisdiction over Section 4(f) properties.[7]  AR-27 at 83.  This development process included Section 106 coordination.[8]  The Project's Section 106 consulting parties[9] include

---

[5]      Contraction scour refers to the removal of material from the bed and banks across the width of a water channel.

[6]      Scour holes occur when moving water causes sediment to be removed and scooped out from around a bridge's abutments or piers.

[7]      Section 4(f) of the U.S. Department of Transportation Act of 1966 requires that the use of historic sites be carefully considered and avoided or minimized.

[8]      Section 106 of the National Historic Preservation Act sets certain requirements with which agencies much comply.  First, an agency must define the area of potential effects ("APE").  36 C.F.R. § 800.4(a).  Then the agency must identify any historic properties within the APE.  36 C.F.R. § 800.4(b).  "A historic property is 'any prehistoric or historic district, site, building, structure, or object included on, or eligible for inclusion on' the National Register . . . ."  *Dine Citizens Against Ruining Our Env't v. Bernhardt*, 923 F.3d 831, 846 (10th Cir. 2019) (citing 54 U.S.C. § 300308).  If historic properties are present, the agency must determine whether there is an adverse effect on those properties.  36 C.F.R. § 800.5.  If an adverse effect is determined, then the agency must consult with the Section 106 consulting parties "to develop and evaluate alternatives or modifications to the undertaking that could avoid, minimize, or mitigate adverse effects on historic properties."  36 C.F.R. § 800.6(a).

The Court has endeavored to summarize the relevant studies, deliberation, and consultation that took place during the Project's development.  However, the sheer volume of the administrative record prohibits an exhaustive recitation.  A detailed 14-page timeline of the Project's Section 106 process can be found at AR-26 at 60–73.

[9]      "Consulting parties" are parties that have consultative roles in the Section 106 process.  These parties include the state historic preservation officer ("SHPO"), Indian tribes and Native Hawaiian organizations, representatives of local governments with jurisdiction over the area, and applicants for Federal assistance, permits, licenses, and other approvals.  36 C.F.R. §§ 800.2(c)(1)–(4).  Additional "individuals and organizations with a demonstrated interest in the undertaking *may* participate as consulting parties due to the nature of their legal or economic relation to the undertaking or affected properties, or their concern with the undertaking's effects on historic properties."  36 C.F.R. § 800.2(c)(5) (emphasis added).

the NPS, the United States Army Corps of Engineers, the PaDEP, the Advisory Council on Historic Preservation ("ACHP"), the Pennsylvania State Historic Preservation Officer ("PaSHPO"), the Pennsylvania Historical and Museum Commission, Tinicum Township officials, elected federal and state officials, and other members of the public.  There are a total of 51 consulting parties. AR-27 at 85.

A Determination of Effects Report was prepared by A.D. Marble & Company in 2005 which concluded that the Bridge was not eligible for the National Register and that replacing it would have no adverse effect on the Historic District.  AR-26 at 61.  After both a public officials meeting and a public meeting, comments were received demonstrating public controversy over the historical value of the Bridge and a decision was reached to ask the Keeper of the National Register to render an opinion on the eligibility of the Bridge for the National Register.  *Id.* at 62.  The Keeper determined that the Bridge was eligible for the National Register as a contributing element to the Historic District.  *Id.*

After the Keeper's determination, the first Section 106 consulting party meeting was held.[10] At the meeting, the parties discussed the Keeper's finding that the Bridge is a contributing resource to the Historic District, and it was determined that an updated Determination of Effects report for the Project would be prepared.  AR-27 at 85.  It was also requested that design consultant Urban Engineers provide a report examining whether it would be feasible to reuse the Bridge's existing substructure.  *Id.*

---

[10]     A total of seven Section 106 consulting party meetings took place during the Project's development between 2006 and 2016.
        In addition to the seven meetings with the Project's consulting parties, there were numerous meetings with the public, both in the form of public officials meetings and general public meetings. Summaries of those meetings are in the Project's Final Section 4(f) Evaluation.  *See* AR-27 at 83–84.

At the second meeting, Urban Engineers presented its findings that the existing substructure could not be used, and the Existing Structure Condition Evaluation Report was provided to the consulting parties. *Id.* at 85–86. An alternative analysis was also prepared. AR-26 at 65. After the meeting, the Existing Structure Condition Evaluation was published recommending replacement of the Bridge. *Id.* PennDOT received and responded to comments on the evaluation. *Id.* at 66.

A one-lane bridge option was discussed at the third consulting party meeting. AR-27 at 86. Mitigation and terms for the Memorandum of Agreement[11] were also discussed. AR-26 at 67. In 2013, federal money was programmed for the Project, making FHWA the lead federal agency for the Section 106 process. *Id.* at 68. Upon this change, the consulting party coordination efforts were updated and reinitiated. *Id.*

The fourth meeting focused on Urban Engineers' November 2006 Existing Structure Condition Evaluation Report. AR-27 at 86. After that meeting, PennDOT provided the consulting parties with traffic monitoring data, previous public official meeting and consulting party meeting minutes, inspection reports, maintenance records, and a turning radius study prepared by Urban Engineers. *Id.* A comment response document was also distributed. AR-26 at 69. The Existing Structure Condition Evaluation Report was discussed again at the fifth consulting party meeting. AR-27 at 86. An open forum was also developed to give consulting parties the opportunity to present their opinions and concerns related to the Project. *Id.*

---

[11]   If a project will have an adverse effect on an historic resource and "the agency official and the SHPO/THPO agree on how the adverse effects will be resolved, they shall execute a memorandum of agreement." 36 C.F.R. § 800.6(b)(1)(iv). "A memorandum of agreement executed and implemented pursuant to [36 C.F.R. § 800.6] evidences the agency official's compliance with section 106 and this part and shall govern the undertaking and all of its parts." 36 C.F.R. § 800.6(c).

In response to an invitation by FHWA, in a letter dated December 17, 2013 the ACHP agreed to participate in the Section 106 process.  AR-26 at 45.  A representative of the ACHP attended the final two consulting party meetings.  *Id.*  Defendants provided a revised purpose and need statement in January 2014 and distributed a Core Drilling Investigation Report to the consulting parties in March 2014.  *Id.* at 69–70.

On April 2, 2014, the sixth consulting party meeting was held.  This meeting involved a review of the core borings conducted for the Project, a presentation of a bridge rehabilitation option, and an open forum.  AR-27 at 86.  PennDOT later made an Above-Ground Historic Findings Form and updated Determination of Effects Report available to the consulting parties for review and comment.  AR-26 at 70.  The Determination of Effects Report evaluated a series of alternatives for the Project, including a "no build" alternative, a new roadway alternative totally avoiding the Historic District, a new downstream alignment alternative, two different one-lane alternatives, a two-lane superstructure replacement and substructure rehabilitation alternative, and a variety of two-lane replacement alternatives.  AR-12 at 16.  Responses to comments were provided.  AR-26 at 71–72.  PennDOT, through Urban Engineers, also prepared a Bridge Width Report for FHWA.  AR-10.  The Report concluded that a one-lane bridge design would not meet the Project's purpose and need.  *Id.* at 14.

The seventh and final consulting party meeting focused on minimizing and mitigating any harms caused by the Project, and included a breakout session during which the parties could develop their ideas.  AR-27 at 87.  The ideas were presented to everyone in attendance, and the consulting parties stated whether they disliked, or had no opinion on the ideas presented.  *Id.*  PennDOT later circulated to the consulting parties a mitigation and minimization memorandum

summarizing the ideas generated at the meeting.  AR-26 at 73.  A document providing responses to comments received on the memorandum was distributed to the consulting parties.  *Id.*

A draft categorical exclusion evaluation was made available for review and comment in November 2016.  *Id.*  Again, a document providing responses to the comments was subsequently distributed to the consulting parties.  *Id.*  A draft Memorandum of Agreement was also circulated to the consulting parties, to which the ACHP provided comment.  *Id.*  A final Memorandum of Agreement was executed in August 2018.  *Id.*

Defendants then issued a Final Categorical Exclusion Evaluation and a Final Section 4(f) Evaluation for the Project, the merits of which Plaintiffs now challenge.  These evaluations are the heart of this matter, so their contents are described in detail below.

## V.      Final Categorical Exclusion Evaluation[12]

### A.      Project Description

PennDOT finalized a Class Two Categorical Exclusion Evaluation in which the agency evaluated the two-lane replacement alternative.  *See generally* AR-26.  The two-lane replacement alternative involves fully replacing the Bridge's existing three-span, single structure with a new two-span, two-lane superstructure supported on a reinforced concrete substructure.  *Id.* at 6.  The existing 16-foot wide Bridge will also be replaced to become a 24-foot wide two-lane bridge that meets PennDOT's standards.  *Id.*

The Project will remove the two existing piers and replace them with one center pier, which the Categorical Exclusion Evaluation stated was proposed in coordination with the PaDEP to comply with dam safety and waterway management regulations.  *Id.*  The Project will require in-

---

[12]      The following background facts represent statements and findings contained in the Final Categorical Exclusion Evaluation.  They should not be interpreted as an endorsement by the Court of the accuracy of those statements and findings.

stream working, including demolition of the existing substructure elements, construction of new abutments, and construction of a center pier, as well as temporary stream diversions and the dewatering of areas around the existing substructure to facilitate construction.  *Id.*

"Rip-rap stone scour countermeasures" will also be installed.[13]  *Id.*  The size of the rip-rap used will have a maximum stone size of 24 inches.  *Id.*  Although much of the rip-rap will be underwater in Tinicum Creek, some will be visible above the water line at the base of the abutments and along the edges of the wingwalls.  The Categorical Exclusion Evaluation described the "visual impact" as "minor, as the stone will be choked with natural streambed material and will feature riparian plantings."  *Id.*  If possible, stone for the rip-rap will be locally sourced to try to match the visual appearance of the stone found in the Project area.  *Id.*

The Project will also require a temporary causeway to provide construction access to the Project site.  *Id.*  This effort will involve temporary construction easements, a slope easement, and right-of-way acquisitions.  *Id.*

## B.      Project Purpose and Need

The purpose of the Project is "to provide a crossing for Headquarters Road over Tinicum Creek that is structurally sound and capable of safely and effectively handling the expected vehicular needs of the public and emergency services of the surrounding area."  *Id.* at 7.

Project needs were developed to address a series of "issues" with the Bridge as identified in the Categorical Exclusion Evaluation.  *Id.*  The issues described include the Bridge being closed to the public since 2011 due to a hole in the deck; an inspection determination that the Bridge remains in imminent failure and is structurally deficient; stone displacement and advanced streambed erosion on the Bridge's existing substructure exposing the foundation; the retaining

---

[13]      Rip-rap refers to human-placed rocks along shorelines, streambeds, bridge abutments, and the like to prevent against scour and erosion.

walls showing signs of settlement, base slippage, wall displacement, and localized collapse; and a scour hazard. *Id.* The Categorical Exclusion Evaluation also noted severe deterioration of the Bridge's superstructure, with the majority of the concrete façade being cracked and spalled,[14] causing the steel stringers to be exposed and exhibit extensive section loss, reducing their load carrying capacity. *Id.* The Bridge's concrete deck also exhibits full-depth longitudinal cracking and spalling and large holes covered by steel plates. *Id.* Furthermore, traffic on the Bridge is limited to one lane, and a turning movement analysis showed that the Bridge cannot accommodate Tinicum Township's largest fire response vehicle making a left-hand turn onto the Bridge from Headquarters Road. *Id.* Finally, the Categorical Exclusion Evaluation stated that the sight distance and horizontal curve radius of the western approach to the Bridge does not meet PennDOT safety criteria. *Id.*

In response to the above, the Categorical Exclusion Evaluation listed the following Project needs:

- The Bridge is structurally deficient;
- The Bridge is functionally obsolete;
- The retaining walls exhibit failure;
- Due to the existing structure's geometry and limited roadway width, it cannot safely and effectively accommodate current and future traffic needs including emergency response vehicles; and
- Heavy scour exists along the western abutment resulting in exposure of the Bridge foundations and an increase in the structure's vulnerability to further deterioration.

*Id.*

A goal of the Project is to develop a solution to these needs that is sensitive to the historic and rural nature of the Bridge's surrounding area, if not the Bridge itself. *Id.*

---

[14]     Spalling refers to when materials like stone or concrete break into smaller pieces, often via peeling or flaking.

C.      **Section 4(f) Resources**

In describing any permanent and temporary impacts to Section 4(f) resources, the Final Categorical Exclusion Evaluation noted that the Project will require permanently taking a total of 0.015 acres from two parcels that are contributing elements to the Historic District. *Id.* at 74. The Project will also require a slope easement of approximately 0.005 acres. *Id.* The Project work area will need to be dewatered by temporarily diverting flows through a series of flume pipes so that the existing substructure elements can be removed, the new abutments and center pier can be constructed, and the scour countermeasures can be installed. *Id.* These efforts will require temporary occupancies of approximately 0.088 acres of the Historic District, a Section 4(f) resource. *Id.* The Evaluation concluded that the temporary occupancies satisfy 23 C.F.R. § 774.13(d) and do not constitute a "use" under Section 4(f). *Id.*

Under "Remarks," the Evaluation stated:

Within the project area, the Ridge Valley Rural Historic District and its contributing resources (the Headquarters Road Bridge and the adjoining tax parcels) are considered Section 4(f) resources. The parcel on the east side of Sheep Hole Road (Parcel 44-14-3-1) is also a contributing element to the district. The Individual Section 4(f) Evaluation documents the design alternatives considered and their anticipated social, economic, environmental, and cultural impacts. It also describes the alternative(s) that totally avoid the use of the Section 4(f) resources and an analysis of the alternatives to determine which result in the least overall harm to the resource.

Seven alternatives are considered in the Draft Individual Section 4(f) Evaluation, including the No-Build and Total Avoidance Alternative. Based on the evaluation of alternatives, it was determined that there are no feasible and prudent avoidance alternatives. Further, upon completion of the least overall harm analysis, the recommended preferred alternative was identified as that which causes the least overall harm to the Section 4(f) resource.

The two-lane replacement alternative addresses the existing bridge's structural deficiency (both superstructure and substructure), thus improving the load carrying capacity and meeting the structurally deficient need. This alternative improves the operational efficiency of the bridge by providing a two-lane bridge (meeting PennDOT and American Association of State Highway and Transportation Officials [AASHTO] requirements based on traffic volume), thus meeting the

functionally obsolete need.  This alternative addresses the turning radius issues for emergency service vehicles and is sound from an engineering prospective.  Due to the roadway classification and traffic volume on the bridge, PennDOT's Design Manual 2 requires a roadway and bridge width of 24 feet curb-to-curb.  The ADT along this roadway prior to its closure varied from 900 in 2001 (prior to the closure of both the Geigel Hill Road and Dark Hollow Road bridges) to 681 in 2008, both greater than 400.  The two-lane replacement alternative meets the 24 feet curb-to-curb width criteria and was carried forward to the assessment of least overall harm. . . .

Mitigation is incorporated, and PennDOT and the FHWA will coordinate with the Section 106 Consulting Parties regarding minimization and mitigation measures . . . .[15]

*Id.* at 75.

### D.    Aquatic Resources

The Final Categorical Exclusion Evaluation concluded that the Project will result in a benefit to the free-flowing nature of Tinicum Creek by removing an existing abutment and pier from the stream channel.  *Id.* at 22.  The Project is not expected to have an impact on the water quality in the long term, and short-term impacts are expected to be mitigated by the Project's use of standard erosion and sediment pollution control best management practices.  *Id.*

Furthermore, the western abutment will be moved outside the stream channel and the fill in front of it will be graded to direct the channel into the existing downstream location.  *Id.*  The Evaluation found that these changes will increase the cross-sectional area of the stream, improving the hydraulic capability of the replacement compared to the existing Bridge.  *Id.*  The replacement will also maintain the natural free-flowing nature of Tinicum Creek and will not present conditions that impede fish passage.  *Id.*  Although the Project's construction will likely temporarily impact aquatic life, only half of Tinicum Creek will be dewatered at a time, allowing fish to pass through

---

[15]    The mitigation efforts related to Section 4(f) resources are described below in Section V(E)(4).

the Project area during construction.  *Id.*  Measures are also planned to promote the recolonization of macroinvertebrates[16] and finfish.  *Id.*

Tinicum Creek is classified as a Federal Scenic River or Stream within the Lower Delaware Wild and Scenic River.  *Id.* at 23.  According to the Evaluation, Tinicum Creek is a contributing resource to the Historic District, and the Historic District is considered an ORV to the Lower Delaware River.  *Id.*  The NPS expressed concern over protecting the Historic District as an ORV.  *Id.*  The NPS found that replacing the Bridge is an adverse effect but concluded that the Project as a whole appropriately minimizes the impacts to the Historic District.  *Id.*  The Evaluation noted that "an Adverse Effect, as determined under Section 106 does not equate to an Adverse Effect, as determined under Section 7 of the Wild and Scenic Rivers Act."  *Id.*

### E. Mitigation Remarks

The Final Categorical Exclusion Evaluation included the following "mitigation remarks" relating to various components of the Project.

#### 1. Aquatic Resources and Federal Wild and Scenic Rivers and Streams

To minimize visible rock, rock scour protection surrounding the Bridge's abutments will be choked with top-soil and seeded with a riparian seed mix.  *Id.* at 22.  One foot of streambed material will also be retained and placed on the rip-rap at the center pier.  *Id.*  As noted, the rip-rap used for scour protection will have a maximum stone size of 24 inches, the stone will be locally sourced if possible, and a red shale or argillite stone will be specified in the Project's special provisions to fit in with the Bridge's surrounding geologic conditions.  *Id.*

---

[16]     Macroinvertebrates are organisms that do not have backbones and are visible to the naked eye without the aid of a microscope.

### 2.   Soil Erosion and Sedimentation

The Project will implement erosion and sediment pollution control best management practices to avoid or minimize soil erosion and sedimentation.  *Id.* at 26.

### 3.   Vegetation

The Project will prevent the introduction of invasive plant species onto the highway right-of-way by stabilizing and seeding or re-vegetating any disturbed vegetative areas.  *Id.* at 32. Efforts will also be taken to minimize the movement of existing invasive plant parts in the Project area.  *Id.*  Trees that are removed will be replaced by planting native plants, and the final design will include an investigation into the planting of native sapling trees.  *Id.*

### 4.   Cultural Resources and Section 4(f) Resources

The following mitigation measures and standard treatments were developed in coordination with the Section 106 consulting parties and were included in the Memorandum of Agreement.  *Id.* at 44.

PennDOT will form a Design Advisory Committee ("DAC") for the Project consisting of no more than nine members.  *Id.*  The NPS, Bucks County Officials, Tinicum Township Supervisors, the PaSHPO, and the ACHP will each be invited to provide one member.  *Id.*  The DAC will be asked to review the Project's plans and specifications and to provide feedback on aesthetic elements.  *Id.*  This review will occur at least three times during the Project's development process.  *Id.*  The DAC will also be engaged during the early stages of construction to provide input on the masonry sample panel.  *Id.*

PennDOT will incorporate the following mitigation measures into the Bridge demolition and replacement:

- During demolition of the existing structure PennDOT will salvage stone from the existing structure's masonry components will be salvaged for use in the proposed 2-lane concrete structure.
- Using a stone mason with experience in similar projects, the stone mason will use the salvaged stone as a stone facing on concrete components of the new structure, including the abutments, wingwalls and approach roadway barriers. The stone facing should closely match, to the extent possible, the orientation and layout of existing stone, taking special care to place larger cut stones at the base of the substructure and transitioning to smaller rubble course at the top.
- PennDOT will construct a masonry sample panel prior to the start of the application of any masonry facing to demonstrate the layout and orientation of the proposed stone work as well as mortar pointing.
- PennDOT will hold a field meeting with members of the DAC to review the masonry sample panel and provide comment. The result of the field meeting together with the masonry sample panel will serve as a guide for all stone work which is to take place on the structure.
- PennDOT will construct a bridge with the minimum allowable roadway width, in accordance with the applicable design standards, within the same approximate footprint as the existing bridge.
- The new bridge will incorporate brown, painted, Type 10M railing.
- The existing bridge plaque will be retained and incorporated into the new bridge.
- Rock scour protection surrounding bridge abutments will be choked with top-soil and seeded with a riparian seed mix to minimize, to the extent possible, visible rock.
- The DAC will be invited to discuss the creation and incorporation of a plaque into the new bridge. If the DAC is in favor of incorporating a plaque PennDOT will create and incorporate a plaque into the new bridge. Minimally, the plaque should indicate the date of construction of the new bridge and reference that the new bridge incorporated stone from the historic bridge that stood previously at this location. The DAC will be invited to review and comment on wording for the plaque, the material to be utilized, and the location on the new bridge.

*Id.*

PennDOT will also complete measured drawings of the Bridge which will be provided to the signatory parties and offered to the Library of Congress Historic American Engineering Record. *Id.*

Finally, in consultation with the signatory parties, PennDOT will develop either a web publication or physical display discussing the history and significance of the Historic District, as well as the Bridge as a contributing element to the Historic District. *Id.* Consulting parties and

DAC members will also be invited to comment on possible locations for a display if a physical display is selected.  *Id.*

### 5.    *Non-Resource Specific Mitigation*

The current road detour will be maintained throughout construction of the replacement.  *Id.* at 91.  Any changes in traffic control plans will be coordinated with local officials and agencies prior to construction.

### 6.    *Public Controversy on Environmental Grounds*

The Final Categorical Exclusion Evaluation noted that a total of four public meetings, an all-day plans display, a public hearing, and seven Section 106 Consulting Party meetings were held to collect feedback, address concerns, and develop mitigation and minimization measures for the Project's effects.  *Id.* at 82.  The Evaluation concluded that the potential impacts to Tinicum Creek and the Historic District are not significant in light of the Project's proposed mitigation.  *Id.*

### F.    Conclusion

Based upon the Final Categorical Exclusion Evaluation, it was determined that the Project qualifies for a Level 2 categorical exclusion in accordance with 23 C.F.R. § 771.117(d)(13) and will not result in any of the four unusual circumstances listed in 23 C.F.R. § 771.117(b).  *Id.* at 97.

## VI.    Final Individual Section 4(f) Evaluation[17]

### A.    Section 4(f) Overview

Section 4(f) of the Department of Transportation Act of 1966, codified at 49 U.S.C. § 303 with implementing regulations at 23 C.F.R. § 774, applies to publicly owned land within parks, recreation areas, wildlife and waterfowl refuges, and historic sites.  AR-27 at 7.  "For purposes of

---

[17]    As with the Final Categorical Exclusion Evaluation, the following background facts represent statements and findings contained in the Final Individual Section 4(f) Evaluation.  They should not be interpreted as an endorsement by the Court.

Section 4(f), historic sites are Section 4(f) properties if they are listed in or determined eligible for inclusion in the National Register of Historic Places (National Register) and/or if they are contributing elements to a historic district." *Id.*

Unless the impact in a case is determined to be *de minimis*, FHWA may only approve the use of a Section 4(f) property if it determines that (1) there is no prudent and feasible avoidance alternative to the use of land from the property; and (2) the project includes all possible planning to minimize harm from the use to the property. *Id.*

The Final Individual Section 4(f) Evaluation analyzed the anticipated social, economic, environmental, and cultural impacts of each of the Bridge's design alternatives. *Id.* at 9. Because this Project was classified as a categorical exclusion, neither an Environmental Impact Statement nor an Environmental Assessment was prepared. *Id.*

## B. Project Purpose and Need

Like the Final Categorical Exclusion Evaluation, the Final Section 4(f) Evaluation listed the following Project needs:

- The Bridge is structurally deficient. (A structure is structurally deficient if it has deterioration to one or more of its major components: the deck, superstructure and/or substructure.)
- The Bridge is functionally obsolete. (A structure is functionally obsolete if it does not have geometric features that meet current design standards.)
- The retaining walls exhibit failure.
- Due to the existing structure's geometry and limited roadway width, it cannot safely and effectively accommodate current and future traffic needs including emergency response vehicles.
- Heavy scour exists along the western abutment resulting in the exposure of the Bridge foundations and an increase in the structure's vulnerability to further deterioration.

*Id.* at 16.[18]

---

[18]     Recognizing that these "needs" have already been recounted in this Memorandum, the Court hastens to explain that the redundancy is not the result of inattentive editing, but rather because this procedure-laden regulatory scheme presents at each juncture the need to set forth certain findings and conclusions.

### C.    Identification and Description of Section 4(f) Properties

As explained above, the Section 4(f) Evaluation explained that historic sites are Section 4(f) properties if they are listed in or determined eligible for inclusion in the National Register, or if they are contributing elements to an historic district.  *Id.* at 18.  The Evaluation concluded that within the Project's area, "the Ridge Valley Rural Historic District, listed in the National Register, and its contributing resources (the Headquarters Road Bridge and the adjoining tax parcels) are considered Section 4(f) properties."  *Id.*  "[T]he bridge and the contributing parcels adjacent to the bridge are all considered Section 4(f) properties."  *Id.*  The Evaluation concluded that Tinicum Creek, however, is not a Section 4(f) property.  *Id.* at 22.

### D.    Alternative Analysis

The Section 4(f) Evaluation analyzed a "no build" option and six "alternatives" for the Project to determine which, if any, were prudent and feasible.  The Evaluation acknowledged that if a feasible and alternative exists that would avoid all impact to Section 4(f) properties, that "total avoidance alternative" must be selected.  AR-27 at 24.  If a feasible or prudent total avoidance alternative does not exist, then the agency must select the alternative that would result in the least overall harm to Section 4(f) properties.  *Id.*

In completing the Section 4(f) Evaluation, a "no build" option and the following alternatives were considered:

1. New roadway that totally avoids the Historic District;
2. New alignment downstream;
3. One-lane rehabilitation;
4. Two-lane rehabilitation;
5. One-lane replacement; and
6. Two-lane replacement bridge on existing alignment.[19]

---

[19]    The Evaluation also considered three additional variations on the sixth alternative to build a two-lane replacement bridge on existing alignment.  AR-27 at 68–76.

AR-27 at 23–81.  The no build option and the new roadway alternative were the only two options that would completely avoid the use of the Historic District.  *Id.* at 32.

### 1.  No Build Option

The no build option would leave the Bridge as-is with no new construction, keeping the Bridge closed to vehicular traffic indefinitely.  AR-27 at 33.  A current 12.2-mile detour would remain in place, which is the route used by emergency vehicles.  *Id.*  No Section 4(f) use would occur.  *Id.*  However, the Evaluation noted that the Bridge would continue to deteriorate, eventually requiring removal and thus affecting the Historic District's integrity.  *Id.* at 33–34.  This removal would benefit Tinicum Creek's free-flowing nature, but prior to removal the Bridge's piers would continue to cause debris accumulation and scour the streambed.  *Id.* at 34.

The Evaluation concluded that the no build option is not prudent because it does not meet the Project's purpose of providing a safe and structurally sound crossing for the public or emergency services and it does not address the Project needs.  *Id.*  Having determined that the no build option is not prudent, it was not carried forward into the least overall harm assessment.  *Id.*

### 2.  Alternative 1: New Roadway Totally Avoiding the Historic District

Alternative 1 would involve constructing a new 1.67-mile roadway around the Historic District to the east and south of the Bridge.  *Id.*  The Bridge would be untouched, but aerial utility lines adjacent to the Bride would need to be relocated.  *Id.*  The estimated cost of this alternative is $10–$15 million.  *Id.*

Construction would require rights-of-way for 1.67 miles of roadway, as well as the bisecting of farmed parcels, at least two total residential displacements, eight partial residential acquisitions, and temporary construction easements of residential properties.  *Id.* at 37.  Alternative 1 is the only alternative that requires displacement of residential properties.  *Id.*

Alternative 1 avoids the use of Section 4(f) properties.  *Id.*  However, as with the no build option, the untouched Bridge would continue to deteriorate, eventually requiring removal and affecting the Historic District's integrity.  *Id.*  Alternative 1 would also require two additional waterway crossings, including one through Tinicum Creek, which would add obstructions to its free-flowing nature.  *Id.*

The Evaluation determined that Alternative 1 is a feasible alternative that would provide a safe and functional crossing of Tinicum Creek.  *Id.* at 38.  However, due to the costs of engineering, improving several intersections, and rights-of-way, Alternative 1 would also cost $6–$11 million more than the other Project alternatives.  *Id.*  Considering the total cost of $10–$15 million, as well as two total residential displacements, eight partial residential acquisitions, and significant impacts to the natural environment, it was determined that Alternative 1 is not reasonable or prudent and it was not carried into the least overall harm assessment.  *Id.*

> 3.     *Alternative 2: New Alignment Downstream*

Alternative 2 would have a new roadway alignment and bridge crossing constructed downstream of the existing Bridge to avoid impacts to the Bridge.  *Id.* at 39.  The existing roadway and Bridge could be preserved as a pedestrian crossing, but the Evaluation noted that the Bridge would continue to deteriorate.  *Id.*

This alternative would still require a Section 4(f) use of the Historic District.  *Id.* at 41. Approximately one acre of land from a contributing resource to the Historic District would need to be acquired, the new bridge would be a modern element that would alter the historic setting, and the new bridge would also obscure the view of the existing Bridge.  *Id.*  These changes would result in a Section 106 adverse effect to the Historic District.  *Id.*

Alternative 2 provides a safe crossing but is expected to cause an increase in flood elevations, which could damage nearby properties and increase scouring, and it requires the most land from the Historic District as compared to all of the other alternatives. *Id.* The Evaluation found that Alternative 2 was not reasonable or prudent because of substantial impacts to nearby properties through rights-of-way acquisition, an additional encroachment in the stream, the need for a condition letter of map revision, and a cost of $1.5 million more than the remaining alternatives. *Id.* Alternative 2 was not included in the least overall harm assessment. *Id.*

### 4. Alternative 3: One-Lane Rehabilitation

Alternative 3 would rehabilitate the existing one-lane Bridge. *Id.* at 43. As explained in detail in the Evaluation, Alternative 3's one-lane rehabilitation would not meet necessary PennDOT criteria. *Id.* at 43–46. Therefore, Defendants would only agree to construction of the one-lane bridge if Tinicum Township would assume responsibility for the ownership and future maintenance of the Bridge. *Id.* at 46. The Township is not willing to take ownership. *Id.*

Alternative 3 would use Section 4(f) properties. *Id.* at 48. The Bridge's superstructure would need to be removed, constituting a Section 106 adverse effect and a use under Section 4(f). *Id.* However, the construction would be context sensitive to the Historic District. *Id.*

The Evaluation found that Alternative 3 failed to meet various Project needs. *Id.* at 49. The Bridge would remain functionally obsolete because it would continue to have a width of less than 24 feet from curb to curb, failing to meet the criteria in PennDOT's highway design manual. *Id.* This finding was supported by the Bridge Width Evaluation memo prepared by Urban Engineers. *Id.* FHWA agreed with the determination that a single-lane bridge would fail to meet the Project's purpose and need. *Id.*

Alternative 3 would also fail to accommodate emergency service vehicles, address issues with western approaches, and remove the need for a weight limit.  *Id.*  Because a weight limit would still be required, Alternative 3 would not meet the Project's structural deficiency need, a finding the Evaluation supported with a review of the Architect's and Builder's Pocket-Book.  *Id.*

The Evaluation concluded that Alternative 3 is not prudent because it does not address the structurally deficient or functionally obsolete needs.  *Id.* at 50.

### 5.    *Alternative 4: Two-Lane Rehabilitation*

For Alternative 4, the Bridge's existing stone masonry substructure piers would be rehabilitated, the abutments and wing walls would be replaced, and a modern two-lane superstructure would be constructed.  *Id.*  Due to the changes to the Bridge, Alternative 4 would result in a Section 106 adverse effect and a use under Section 4(f).  *Id.* at 56.  The Evaluation estimated that if Alternative 4 were selected, the Bridge would likely no longer contribute to the Historic District.  *Id.*  However, construction would be undertaken in a manner sensitive to the context of the Historic District.  *Id.* at 56–57.

Although Alternative 4 would address some of the Bridge's structural deficiencies, the Evaluation found that it would not fully address the structurally deficient need.  *Id.* at 57.  It also would not address the functionally obsolete need because it would not meet PennDOT's standard of 24 feet from curb to curb.  *Id.*  Furthermore, Alternative 4 would not fully address the Project need of safely and effectively accommodating emergency response vehicles because the largest Tinicum Township firetruck would require two turn movements to make a turn that would still veer the truck into oncoming traffic.  *Id.* at 57–58.  Therefore, the Evaluation concluded that Alternative 4 is not a prudent alternative.  *Id.* at 58.

6.     *Alternative 5: One-Lane Replacement*

Alternative 5 is the other one-lane bridge alternative that PennDOT studied in addition to

Alternative 3.  *Id.*  Alternative 5, however, is a replacement alternative and would involve replacing

the Bridge's substructure units and constructing a new 18-foot, single traffic lane superstructure.

*Id.*  As with Alternative 3, Alternative 5's one-lane replacement would not meet PennDOT criteria

and therefore could only be constructed if Tinicum Township would assume responsibility for the

ownership and future maintenance of the Bridge, which the Township is not willing to do.  *Id.*

Alternative 5's replacement of the Bridge would constitute a Section 105 adverse effect

and Section 4(f) use.  *Id.* at 60.  However, construction would be conducted in a context sensitive

manner and in accordance with the Secretary of the Interior's Standards.  *Id.*

Because the width of the replacement bridge would be less than 24-feet, the Evaluation

determined that Alternative 5 does not meet the functionally obsolete Project need, a conclusion

supported by Urban Engineers' Bridge Width Evaluation memo and agreed with by FHWA.  *Id.*

Furthermore, Alternative 5 would not accommodate emergency service vehicles or resolve issues

with western approaches.  *Id.* at 60–61.  The Evaluation found Alternative 5 to be neither

reasonable nor prudent.  *Id.* at 61.

7.     *Alternative 6: Two-Lane Replacement Bridge on Existing Alignment*

Alternative 6 is a two-lane replacement alternative that would require a full replacement of

the Bridge's existing structure with a modern, two-lane superstructure supported by a reinforced-

concrete substructure.  *Id.*  The replacement bridge would have two 12-foot travel lanes for a curb-

to-curb width of 24 feet.  *Id.*

The removal and replacement of the entire Bridge would constitute an adverse effect to the

Historic District.  *Id.* at 65.  The Bridge's two piers would be removed and a single substructure

pier would be constructed in their place.  *Id.*  The replacement bridge would be wider than the

current Bridge, but its height, massing, and proportions would be similar, and the design would be context sensitive.  *Id.*

Alternative 6 would also cause temporary environmental impacts to Tinicum Creek, but the Evaluation determined that it would benefit the Creek in the long term by eliminating scour and stream meandering and improving its free-flowing nature.  *Id.* at 66.  The Evaluation noted that consultation with the NPS regarding the Project's impact on Tinicum Creek's designation as a Wild and Scenic River is ongoing.  *Id.*

The Evaluation concluded that Alternative 6 addresses the functionally obsolete and structural deficiency Project needs, as well as the turning radius issues for emergency service vehicles.  *Id.* at 66–67.

### E.   Least Overall Harm Assessment

Alternatives 3, 4, 5, and 6 proceeded into the assessment of least overall harm.  *Id.* at 67.  However, Alternatives 3, 4, and 5 were all subsequently dismissed because they failed to fully meet the Project's structurally deficient or functionally obsolete needs.  *Id.* at 67–68.  With these alternatives dismissed, the Evaluation focused on minimizing impacts of Alternative 6 to Section 4(f) properties.  *Id.* at 68.

#### 1.   *Alternatives 6A, 6B, and 6C*

First, the Evaluation considered Alternative 6A, which would reduce the travel corridor to two 10-foot lanes rather than 12-foot lanes.  *Id.*  Alternative 6A reduced the overall cost slightly compared to Alternative 6.  *Id.*  Alternative 6A would still result in a Section 4(f) use because the removal and replacement of the Bridge would have a Section 106 adverse effect to the Historic District.  *Id.*  This alternative would also require a design exemption because PennDOT's requirements call for a width of at least 24 feet and Alternative 6A would only be 20 feet wide.  *Id.*  The Evaluation concluded that because Alternative 6A does not meet current design standards

and fails to address the Project's functionally obsolete need, Alternative 6A is not a reasonable or prudent alternative. *Id.* at 70.

Next, the Evaluation analyzed Alternative 6B. *Id.* at 71. There, new abutments would be constructed behind the existing abutments to support a new two-lane superstructure, preserving the existing substructure elements for purely aesthetic purposes. *Id.* Alternative 6B would still result in a Section 4(f) use because the Bridge's 1919 superstructure would be demolished and replaced, having a Section 106 adverse effect to the Historic District. *Id.* Although Alternative 6B aims to minimize effects on the Historic District by maintaining some of the Bridge's materials, the Evaluation found that the replacement bridge would be of larger size and scale and have a greater visual impact to the Historical District. *Id.* Leaving both piers would also require regular maintenance, increasing costs over the Bridge's life cycle, and would increase the potential for contraction scour and sediment deposition. *Id.* The Evaluation determined that Alternative 6B would not result in impact avoidance to the Bridge but would decrease the overall impact to the Bridge structure. *Id.* at 74. However, the Evaluation also found that Alternative 6B would have a negative impact to the floodplain and could have a negative impact to Tinicum Creek hydraulics. *Id.* Due to these environmental impacts, Alternative 6B was dismissed. *Id.*

Finally, the Evaluation considered Alternative 6C. *Id.* Like Alternative 6B, Alternative 6C was designed to replace the Bridge while maintaining existing substructure elements. *Id.* For Alternative 6C, the existing abutments, wing walls, and superstructure would be replaced and the existing piers would remain in the channel for only aesthetic purposes. *Id.* There would still be a Section 4(f) use due to the Section 106 adverse effect to the Historic District stemming from the demolition of the Bridge's superstructure. *Id.* The size and scale of the replacement would be larger than the current Bridge but would not dramatically change the size, scale, massing,

proportion, and spatial relationships of the Bridge within its surroundings and the Historic District. *Id.* However, leaving the existing piers in their current location would require regular maintenance, may adversely impact Tinicum Creek's free-flowing nature, and could increase the potential for contraction scour and sediment deposition, reducing the Creek's water quality. *Id.* at 76. Like Alternative 6B, the Evaluation ultimately dismissed Alternative 6C because of its impact to the floodplain and Tinicum Creek hydraulics as compared to Alternative 6. *Id.*

### 2. *Plans to Minimize Harm to Section 4(f) Properties*

Mitigation measures were developed that will be applied to the alternative resulting in the least overall harm. *Id.* As a result of coordination with the Section 106 consulting parties and consideration of impacts to Section 4(f) properties, a series of mitigation measures were included in the Project's Memorandum of Agreement. *Id.* at 77. Those mitigation measures are listed in Section V(E)(4), *supra*.

### 3. *Determination of Least Overall Harm*

Because the Evaluation determined that there were no prudent and feasible total avoidance alternatives, it evaluated which alternative caused the least overall harm. *Id.* at 78. As part of the harm analysis, the Evaluation addressed the following factors for each alternative as provided by 23 C.F.R. § 774.3(c):

1. The ability to mitigate adverse impacts to each Section 4(f) property (including any measures that result in benefits to the property);
2. The relative severity of remaining harm, after mitigation, to the protected activities, attributes, or features that qualify each property for Section 4(f) protection;
3. The relative significance of each Section 4(f) property;
4. The views of the officials with jurisdiction over each Section 4(f) property;
5. The degree to which each alternative meets the Project purpose and need;
6. After reasonable mitigation, the magnitude of any adverse impacts to resources not protected by Section 4(f); and
7. Substantial cost differences among the alternatives.

*Id.* at 78–79. The Evaluation's analysis of these factors, *id.* at 80–81, is reproduced in full in Table A.

**Table A**

| Alternatives | 1. The ability to mitigate adverse impacts to each Section 4(f) property (including any measures that result in benefits to the property) | 2. What is the relative severity of the harm to the protected activities, attributes, or features that qualify each property for Section 4(f) protection? | 3. What is the relative significance of each Section 4(f) property? | 4. What is the view of the officials with jurisdiction over each Section 4(f) property? | 5. What is the degree to which each alternative meets the project purpose and need for the project? | 6. What is the magnitude of any adverse impacts to the resources not protected by Section 4(f)? | 7. What is the cost of each alternative? |
|---|---|---|---|---|---|---|---|
| Alternative 3 | Same for all alternatives | Alternative 3 requires the removal of the bridge superstructure, which would constitute a Section 106 adverse effect. | Same for all alternatives | SHPO reviewed an *Alternative Analysis- Additional Information* document and agreed with the information presented in the document.  SHPO stated "It is our opinion that there has been sufficient consideration of designs that accommodate project purpose and need while avoiding/minimizing effects to the National Register listed Ridge Valley Rural Historic District." (See Appendix B.) | Alternative 3 does not meet PennDOT criteria of a bridge width of 24 feet curb-to-curb; thus, it does not meet the functionally obsolete need. While the abutments are to be reconstructed, the original piers remain. The original piers were not designed for modern loadings and their reconstruction may still require a posted weight limit thus Alternative 3 does not meet the structurally deficient need. | The piers remain in Alternative 3; these impact the creek's free-flowing nature. The two piers in the channel would continue to cause debris accumulation during high flood events, which would lead to continued scouring of the stream bed around the piers and abutments impacting water quality. | $3,854,875 |
| Alternative 4 | Same for all alternatives | Alternative 4 removes bridge superstructure, both abutments, and wing walls while rehabilitating a portion of the existing piers, resulting in a Section 106 adverse effect. | Same for all alternatives | Same as Alternative 3 | Alternative 4 addresses some of the structural deficiencies of the existing bridge since this alternative replaces the superstructure and reconstructs the piers and abutments. However, the reconstruction of the piers and abutments has limitations since the original piers remain, and they were not designed to carry modern loads. Therefore, it appears that this alternative does not fully address the structurally deficient need. | Same as Alternative 3 | $3,521,132 |
| Alternative 5 | Same for all alternatives | The replacement of the bridge would constitute a Section 106 adverse effect. | Same for all alternatives | Same as Alternative 3 | Alternative 5 does not meet PennDOT criteria of a bridge width of 24 feet curb-to-curb; thus, it does not meet the functionally obsolete need. | While there are temporary environmental impacts to Tinicum Creek which is a Wild and Scenic River, the permanent condition is a benefit to the hydraulics of Tinicum Creek. | $3,021,998 |
| Alternative 6 | Same for all alternatives | Alternative involves superstructure and substructure replacement which would be a Section 106 adverse effect. | Same for all alternatives | Same as Alternative 3 | Meets project purpose and need | While there are temporary environmental impacts to Tinicum Creek which is a Wild and Scenic River, the permanent condition is a benefit to the hydraulics of Tinicum Creek. | $3,319,537 |

**Table A Cont.**

| Alternatives | 1. The ability to mitigate adverse impacts to each Section 4(f) property (including any measures that result in benefits to the property) | 2. What is the relative severity of the harm to the protected activities, attributes, or features that qualify each property for Section 4(f) protection? | 3. What is the relative significance of each Section 4(f) property? | 4. What is the view of the officials with jurisdiction over each Section 4(f) property? | 5. What is the degree to which each alternative meets the project purpose and need for the project? | 6. What is the magnitude of any adverse impacts to the resources not protected by Section 4(f)? | 7. What is the cost of each alternative? |
|---|---|---|---|---|---|---|---|
| Alternative 6A | Same for all alternatives | Alternative involves superstructure and substructure replacement which would be a Section 106 adverse effect. Has the same Section 4(f) use of the contributing parcels as Alternative 6. | Same for all alternatives | Same as Alternative 3 | Due to the roadway classification and anticipated traffic volume on the bridge, PennDOT's DM-2 requires a roadway and bridge width of 24-feet, curb-to-curb. Therefore, Alternative 6A does not meet this criterion. | Same as Alternative 6 | $3,226,971 |
| Alternative 6B | Same for all alternatives | Alternative involves superstructure and substructure replacement which would be a Section 106 adverse effect. Has less use of the contributing parcels than Alternative 6. | Same for all alternatives | Same as Alternative 3 | Meets project purpose and need | Alternative impacts floodplain and could have negative impact to stream hydraulics. Alternative keeps 2 piers in Tinicum Creek; this has the potential to adversely impact the free-flowing nature of the creek, one of the key provisions of the WSR Act. | $4,693,477 |
| Alternative 6C | Same for all alternatives | Alternative involves superstructure and substructure replacement which would be a Section 106 adverse effect. Has less use of the contributing parcels than Alternative 6. | Same for all alternatives | Same as Alternative 3 | Meets project purpose and need | Alternative impacts floodplain and could have negative impact to stream hydraulics. Same temporary impacts to Tinicum Creek as Alternative 6. Alternative keeps 2 piers in Tinicum Creek; this has the potential to adversely impact the free-flowing nature of the creek, one of the key provisions of the WSR Act. | $4,350,425 |

### F.      Final Finding

In conclusion, the Section 4(f) Evaluation stated that alternatives were considered to totally avoid the use of Section 4(f) properties, but there is not a reasonable, feasible, or prudent total avoidance alternative.  *Id.* at 89.  After completing a least overall harm analysis balancing the 23 C.F.R. § 774.3(c) factors, the Evaluation determined that:

> [T]he alternative that resulted in the least overall harm was Alternative 6, the Replacement on Existing Alignment, Two-Lane 12-foot travel lanes.  Therefore, there is no feasible and prudent alternative to the use of Section 4(f) property, and Alternative 6, the Replacement on Existing Alignment, Two-Lane 12-foot travel lanes incorporates all possible planning to minimize harm to the Ridge Valley Rural Historic District.

*Id.*

## LEGAL STANDARD

The Administrative Procedure Act governs a court's review of an agency action under NEPA and Section 4(f).  *Defs. of Wildlife v. N.C. Dep't of Transp.*, 762 F.3d 374, 393 (4th Cir. 2014).  "While summary judgment is the proper mechanism for deciding, as a matter of law, whether an agency's action is supported by the administrative record and consistent with the APA standard of review, because the district judge sits as an appellate tribunal in such cases, the usual summary judgment standard does not apply."  *Dorley v. Cardinale*, 119 F. Supp. 3d 345, 351 (E.D. Pa. 2015).  Rather, district courts "may only set aside an agency's action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.'"  *Id.* at 352 (quoting 5 U.S.C. § 706(2)(A)).

"To determine whether an agency acted arbitrarily and capriciously, a court looks to whether the agency relied on factors outside those Congress intended for consideration, completely failed to consider an important aspect of the problem, or provided an explanation that is contrary to, or implausible in light of, the evidence."  *NVE, Inc. v. Dep't of Health & Human Servs.*, 436

F.3d 182, 190 (3d Cir. 2006) (citing *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  Reversal is inappropriate "unless the evidence not only supports a contrary conclusion, but compels it." *Yitang Sheng v. Att'y Gen. of U.S.*, 365 F. App'x 408, 410 (3d Cir. 2010) (quoting *Abdille v. Ashcroft*, 242 F.3d 477, 483–84 (3d Cir. 2001)).  This narrow scope of review is designed "to avoid substituting a court's judgment for that of the agency." *Dorley*, 119 F. Supp. 3d at 352 (citation omitted).

### DISCUSSION

Plaintiffs ask the Court to set aside Defendants' approval of a categorical exclusion for the Project and the Final Section 4(f) Evaluation, claiming that both determinations were arbitrary and capricious.  They contend that there are multiple circumstances present that preclude the issuance of a categorical exclusion, and that Plaintiffs' preferred alternative of rehabilitation is both prudent and feasible and would cause the least harm to historic resources.  Defendants respond that they took the necessary hard look at the Project's environmental impacts, mitigated the Project's harms, and properly determined that no significant environmental impacts would occur, making their approval of a categorical exclusion in accordance with law.  They also argue that the administrative record supports their conclusion that Plaintiffs' preferred rehabilitation alternative is not prudent, and, therefore, their selection of the replacement alternative was neither arbitrary nor capricious.

To set the stage for this tempestuous review, the Court invokes the words of our deceased colleague, Honorable Jay Carl Waldman:

> [T]he administrative record is voluminous and quite technical, and the submissions of the parties are substantial.  While this has necessitated an exhaustive review, encumbered further by the court's prior lack of familiarity with some of the technical methodology and terminology, the court will confine itself herein to a summary of the respective positions and corresponding evidence in the Record.  To discuss in detail each item in the Record or each assertion, insinuation and argument in this highly contentious litigation would be forbidding and require the razing of a small forest to supply the paper needed for such a product.

*Buckingham Twp. v. Wykle*, 157 F. Supp. 2d 457, 464–65 (E.D. Pa. 2001), *aff'd*, 27 F. App'x 87 (3d Cir. 2002).  Indeed, the administrative record in this matter covers close to 15 years and fills approximately 14,000 pages.  But like a metaphorical bridge over troubled water, the Court endeavors to span the gap between the parties' contentions in order to resolve the arguments in keeping with its duties, obligations, and constraints.  In doing so, the Court is only too mindful— and reminds the parties accordingly—that it cannot turn back the clock to more bucolic, less complicated times.

## I.    The National Environmental Policy Act

When Congress enacted NEPA, it sought to further two goals: "ensure federal agencies consider the environmental consequences of projects before committing resources; and facilitate agencies' communication with the public about their environmental analyses." *Del. Dep't of Nat. Res. & Envtl. Control v. U.S. Army Corps of Engineers*, 685 F.3d 259, 269 (3d Cir. 2012) (citing *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350–52 (1989)).  However, NEPA's function is purely procedural, and the statute "does not mandate particular substantive results." *Tinicum Twp., Pa. v. U.S. Dep't of Transp.*, 685 F.3d 288, 294 (3d Cir. 2012) (quoting *N.J. Dep't of Envtl. Prot. v. U.S. Nuclear Regulatory Comm'n*, 561 F.3d 132, 133 (3d Cir. 2009)).  Instead, the "sweeping policy goals" of NEPA are "realized through a set of 'action-forcing' procedures that require that agencies take a 'hard look at environmental consequences.'" *Robertson*, 490 U.S. at 350 (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)).

In reviewing agency conduct under NEPA, the "sole question" before the Court is "whether the agency's actions were arbitrary or capricious." *Del. Dep't of Nat. Res. & Envtl. Control*, 685 F.3d at 271 (citing 5 U.S.C. § 706(2)(A)).  "[W]hen a federal agency interprets its own regulations, its interpretation is afforded special consideration," and a "court should only reject the agency's interpretation when it is 'unreasonable, plainly erroneous, or inconsistent with

31

the regulation's plain meaning.'" *Friends of Pioneer St. Bridge Corp. v. Fed. Highway Admin.*, 150 F. Supp. 2d 637, 648 (D. Vt. 2001) (quoting *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 738 (10th Cir. 1993)).  "Finally, the Court notes that an agency's decision to categorically exclude a proposed project from environmental review 'is entitled to substantial deference.'"  *Id.* (quoting *City of New York v. I.C.C.*, 4 F.3d 181, 186 (2d Cir. 1993)).

A.     **Whether Defendants' Purpose and Need Statement was Arbitrary, Capricious, or Otherwise Not in Accordance with Law**

Plaintiffs first claim that the Project's purpose and need statement relied on verifiably false and inaccurate data, that the statement was too narrowly defined to exclude rehabilitation, and that PennDOT initiated the NEPA process predetermined to replace the Bridge.

1.     *Whether the Purpose and Need Statement Relied on Verifiably False and Inaccurate Data*

Plaintiffs attack the Project's purpose and need statement by asserting that it was founded on verifiably false and inaccurate data regarding the safety and geometric design of the Bridge. Defendants argue that they relied on numerous studies in crafting the purpose and need statement, including the Existing Structure Condition Evaluation Report, a turning movement study, average daily traffic counts from the Delaware Valley Regional Planning Commission and PennDOT, and PennDOT's own inspection reports for the Bridge.  Defendants also note that additional studies were conducted, including an updated turning radius study, a Core Drilling Investigation Report, and a Bridge Width Evaluation.  Plaintiffs do not respond to Defendants' arguments in their responsive briefing or elaborate on their initial pleading's assertion that the underlying data was false and inaccurate.

On this record, the Court cannot conclude that Defendants' purpose and need statement was arbitrary or capricious due to a reliance on inaccurate or verifiably false data.  It is not the Court's role to re-weigh the facts and evidence that Defendants considered in developing the

Project's purpose and need statement.  The Court also notes that in drafting the Project's purpose and need statement, Defendants provided a draft statement to the consulting parties, including the Delaware Riverkeeper Network.  Plaintiffs admit that in response to comments from the consulting parties, including comments from the Delaware Riverkeeper Network, Defendants made modifications to the purpose and need statement, such as adding a Project goal of developing a solution that was sensitive to the historic and rural nature of the Project's surrounding area.

The record demonstrates an apparently thoughtful and data-driven process behind the development of the Project's purpose and need.  In light of the scientific evidence and public input Defendants have identified in support of their purpose and need statement, the Court concludes that Plaintiffs' "verifiably false and inaccurate data" argument is unavailing.

> 2.   *Whether the Purpose and Need Statement was Defined to Exclude Rehabilitation*

The complaint also includes a claim that the Project's purpose and need statement was narrowly defined to purposefully exclude the possibility of rehabilitation.

"The statement of a project's purpose and need is left to the agency's expertise and discretion," and the Court shall "defer to the agency if the statement is reasonable."  *All. for Legal Action v. F.A.A.*, 69 F. App'x 617, 622 (4th Cir. 2003) (citing *Friends of Se.'s Future v. Morrison*, 153 F.3d 1059, 1066 (9th Cir. 1998)).  "Courts evaluate the reasonableness of an agency objective 'with considerable deference to the agency's expertise and policy-making role.'"  *Citizens for Smart Growth v. Peters*, 716 F. Supp. 2d 1215, 1223 (S.D. Fla. 2010) (quoting *City of Alexandria, Va. v. Slater*, 198 F.3d 862, 867 (D.C. Cir. 1999)), *aff'd sub nom. Citizens for Smart Growth v. Sec'y of Dep't of Transp.*, 669 F.3d 1203 (11th Cir. 2012).  However, "NEPA requires that agencies "may not define the objectives of an action in terms so unreasonably narrow that only one alternative from among the environmentally benign ones in the agency's power would accomplish

33

the goals of the agency's action.'" *Id.* (quoting *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991)).   But once an agency has chosen its Project's goals, the Court reviews "that choice, like all agency decisions to which we owe deference, on the grounds that the agency itself has advanced." *Citizens Against Burlington, Inc.*, 938 F.2d at 196.

Defendants assert that the Bridge is not functional and that they developed the Project needs to address that problem, relying on studies and comments from consulting parties.   They also argue that they evaluated multiple Project alternatives, including rehabilitation. *See Audubon Naturalist Soc'y of the Cent. Atl. States, Inc. v. U.S. Dep't of Transp.*, 524 F. Supp. 2d 642, 666 (D. Md. 2007) ("[T]he Court must also note that purpose and need statements have been consistently upheld where agencies have explored reasonable alternatives that met the agencies' stated objections.   In fact, there has been only one occasion where a Court has struck down an agency's purpose and need statement.").   Defendants assert that they have adhered to NEPA's requirements and the Project's purpose and need statement is not inappropriately defined.

Plaintiffs' summary judgment papers do not respond to Defendants' arguments or address their claim that the Project's purpose and need statement was too narrowly defined.   The Court has not been directed to, or uncovered on its own review, evidence to support a finding that the Project's purpose and need statement was impermissibly narrow.[20]   Defendants relied on scientific evidence evaluating the Bridge's functionality, or lack thereof, as well as feedback from parties

---

[20]      The Court also notes that in response to PennDOT's statement of facts, Plaintiffs proclaim that "[a] rehabilitated Bridge can meet the purpose and need of the Project and is a prudent alternative." Pls.' Resp. to PennDOT's Statement of Facts ¶ 75(b).  Plaintiffs go on to argue in their cross-motion for summary judgment that Delaware Riverkeeper Network "submitted construction plans signed and sealed by a Bridge Rehabilitation Engineer, traffic studies, turning radius modeling, and other expert materials *showing that rehabilitation could meet the purpose and needs of the Project*." Pls.' Mot. for Summ. J. 8 (emphasis added).  Although the Court does not espouse Plaintiffs' position that rehabilitation meets the Project's purpose and needs, and noting of course that parties may argue in the alternative, Plaintiffs' claims that rehabilitation alternatives can meet the Project's purpose and needs undercuts their argument that the purpose and need statement was crafted so narrowly as to exclude any possibility of rehabilitation.

that included Plaintiffs.  The Court grants the purpose and need statement the deference it is due and concludes it was reasonably defined.

>    3.    *Whether PennDOT Improperly Predetermined the Project's Outcome*

Finally, Plaintiffs claim that when PennDOT initiated the NEPA process to select a preferred alternative for the Bridge, PennDOT did so predetermined to replace the Bridge and made commitments to a replacement prior to completing the NEPA process.

"[A]gencies must prepare NEPA documents . . . before making a commitment to a project." *Citizens Advisory Comm. on Private Prisons, Inc. v. U.S. Dep't of Justice*, 197 F. Supp. 2d 226, 242 (W.D. Pa. 2001) (finding agency failed to take the required "hard look" at environmental consequences when it awarded a construction contract prior to preparing NEPA documents), *aff'd*, 33 F. App'x 36 (3d Cir. 2002).  This requires preparing the documents "before any irreversible and irretrievable commitment of resources."  *Conner v. Burford*, 848 F.2d 1441, 1446 (9th Cir. 1988).  However, "NEPA assumes as inevitable an institutional bias within an agency proposing a project."  *Envtl. Def. Fund, Inc. v. Corps of Engineers of U. S. Army*, 470 F.2d 289, 295 (8th Cir. 1972).  With this expected bias in mind, the "test of compliance" under NEPA "is one of good faith objectivity rather than subjective impartiality."  *Id.* at 296 (citation omitted).

>    a.    Early References to a Bridge "Replacement"

Plaintiffs argue that PennDOT referred to the Project as a "bridge replacement project" throughout the early stages of the Project.  *See, e.g.*, AR-3 at 9 (stating, "This is a bridge replacement project" in a 2005 Project scoping document); *id.* at 17 ("PennDOT is proposing replacement of the structure.").  PennDOT responds that documents such as the Project's scoping document were prepared back in 2005 when the agency was operating under an understanding that the Bridge had lost its historic integrity and was likely no longer a contributing element to the Historic District.  It was not until 2006 that the Keeper of the National Register evaluated the

Bridge and determined that it was a contributing element.  Since that time, PennDOT claims that it has treated the Bridge as a contributing element.

Early references to the Project as a "replacement" do not demonstrate that FHWA, the federal agency, failed to act with good faith objectivity.  First, these early statements were made by PennDOT, which is not a federal agency.  It is FHWA that is bound by NEPA, and FHWA only became involved in the Project in 2013, long after the alleged statements of predetermination were made.  Furthermore, the Final Section 4(f) Evaluation and the lengthy record in this case are replete with analyses considering options other than a replacement.  A handful of references to a "replacement" in the early stages of the Project does not undermine the hard look Defendants conducted to consider alternatives other than replacement.

b.    Urban Engineers Contract

Next, Plaintiffs argue that PennDOT contracted with Urban Engineers in 2005 to replace three bridges in Bucks County, including the Bridge at issue here.  Plaintiffs contend that this contract demonstrates that replacing the Bridge was a predetermined outcome to which Defendants committed resources prior to completion of the NEPA process.

Plaintiffs raised this concern during the NEPA process, and PennDOT provided a response. *See* AR-55 at 563–64, 649–50.  To give context to its agreement with Urban Engineers, PennDOT explained that it must develop an anticipated scope of work during projects' planning phases, often years in advance of construction.  Therefore, PennDOT explains, it must make conservative assumptions to ensure there is not a funding shortfall when the time for construction arrives.  PennDOT informed Plaintiffs that funding for the Project was programmed and an engineering agreement was advertised to assume the most expensive scenario, which would be a bridge replacement.  PennDOT noted that the Project's development process nonetheless involved an extensive analysis of various alternatives, including rehabilitation.  Now, in its summary judgment

papers, PennDOT adds that the agreement with Urban Engineers was made for the purposes of completing the necessary preliminary design and environmental studies to complete the NEPA process, and no final design or construction activities were completed, nor were any rights-of-way acquired, prior to FHWA's NEPA decision.

Plaintiffs respond that Defendants' contract with Urban Engineers flies in the face of the requirement that "agencies must prepare NEPA documents . . . before making a commitment to a project." Pls.' Mot. for Summ. J. 9 (alteration in original) (quoting *Citizens Advisory*, 197 F. Supp. 2d at 242). They cite four cases in support of this proposition: (1) *Citizens Advisory Committee on Private Prisons, Inc. v. U.S. Department of Justice*, 197 F. Supp. 2d 226 (W.D. Pa. 2001), *aff'd*, 33 F. App'x 36 (3d Cir. 2002); (2) *Conner v. Burford*, 848 F.2d 1441 (9th Cir. 1988); (3) *Metcalf v. Daley*, 214 F.3d 1135 (9th Cir. 2000); and (4) *Save the Yaak Committee v. Block*, 840 F.2d 714 (9th Cir. 1988). The Court is unpersuaded that Plaintiffs' challenge is meritorious.

In *Citizens Advisory*, the Federal Bureau of Prisons awarded a contract to build a prison and permitted construction to proceed before it took a "hard look" at the environmental consequences of the project. 197 F. Supp. 2d at 231. Although the Bureau had issued an environmental impact statement, the statement did not discuss the environmental issues that might arise during construction and operation of a private prison in the context of any particular location or site. *Id.* at 232. The Bureau sought contract proposals and selected a proposal for the prison to be built at a site in Clearfield County, Pennsylvania. *Id.* at 233–34. The contract was to run for ten years and required that the prison house approximately 1,000 inmates. *Id.* at 234. For the ten-year period, the contract price was $342,692,498. *Id.* The contract also required the prison to be finished within 270 days, and a groundbreaking ceremony was held amidst public backlash less than two months after the contract was awarded. *Id.*

In evaluating a challenge to the Bureau's actions, the district court determined that the Bureau had run afoul of NEPA by awarding the contract before it had "adequately examined the environmental effects of the Clearfield County project." *Id.* at 235.  For example, the Bureau awarded the contract without complete information about whether any endangered species lived on or near the site, without fully examining wetlands on the site, without performing geotechnical testing or taking soil samples, and without receiving comments or suggestions from various environmental agencies. *Id.* The Bureau also failed to consider alternative sites for the prison. *Id.* at 235.  Accordingly, the Bureau's contract and greenlighting of construction were made without the required "hard look" at the environmental consequences.

Next, in *Conner*, the reviewing court found that the Forest Service had violated NEPA when it sold non-"no surface occupancy" leases for oil and gas exploration in two forests prior to completing an environmental impact statement because those particular types of leases did not authorize the government to preclude surface-disturbing activities like drilling and construction. 848 F.2d at 1450.  "By relinquishing the 'no action' alternative without the preparation of an [environmental impact statement], the government subvert[ed] NEPA's goal of insuring [sic] that federal agencies infuse in project planning a thorough consideration of environmental values." *Id.* at 1450.  The Court explained that the "heart" of an environmental impact statement "requires federal agencies to consider seriously the 'no action' alternative before approving a project with significant environmental effects." *Id.*

Turning to *Metcalf*, that case concerned a challenge to the decision of various agencies to authorize the Makah Indian Tribe to resume whaling.  214 F.3d at 1137.  In determining that the agencies had failed to adhere to NEPA's requirements, the court relied in part on the fact that a federal agency entered into a contract with the Makah Indian Tribe in which it committed to make

a formal proposal for a quota of whales for use by the Tribe and to participate in the management

of the hunting harvest. *Id.* at 1143. An evaluation considering the potential environmental impacts

of resuming whaling had not even started prior to the agency entering the contract. *Id.* The court

concluded that by entering the contract, the agency had "made an 'irreversible and irretrievable

commitment of resources'" before engaging in the NEPA process, failing to comply with NEPA.

*Id.* at 1143–44.

Finally, in *Save the Yaak Committee*, the Forest Service did not prepare the necessary

environmental documents "early enough so that [they could] serve practically as an important

contribution to the decisionmaking process and [would] not be used to rationalize or justify

decisions already made." 840 F.2d at 718 (quoting 40 C.F.R. § 1502.5). There, the Forest Service

had awarded reconstruction contracts prior to preparing environmental assessments, and

construction had already commenced by the time the biological assessment was completed. *Id.*

"These events demonstrate[d] that the agency did not comply with NEPA's requirements

concerning the timing of their environmental analysis, thereby seriously impeding the degree to

which their planning and decisions could reflect environmental values." *Id.* at 718–19.

The circumstances here are distinguishable from these cases and do not demonstrate

impermissible predetermination. Unlike the cases cited by Plaintiffs, PennDOT's contract with

Urban Engineers was not awarded to complete a specified course of action prior to the NEPA

process. Indeed, even after the contract was awarded, PennDOT evaluated a multitude of

alternatives, including a "no action" no build alternative, before moving forward with the two-lane

replacement alternative. The act of entering into a contract, in and of itself, does not violate NEPA,

especially where, as PennDOT identifies, no final design or construction activities were completed

and no rights-of-way were acquired for the Project before FHWA's NEPA decision. *See, e.g.*,

*Greene/Guilford Envtl. Ass'n. et al. v. Wykle et al.*, No. 01-910, Doc. No. 119, 13–14 (W.D. Pa. Mar. 24, 2003) (finding no improper predetermination where PennDOT had entered into a contract to conduct a design location and engineering study where the defendant agencies did not engage in final design and there were no contractual obligations compelling a certain result), *aff'd*, 94 F. App'x 876, 879 (3d Cir. 2004).

And even if final design was contemplated by the contract between PennDOT and Urban Engineers, arguably constituting a conflict of interest, "the ultimate question for the court is whether the alleged breach compromised the objectivity and integrity of the NEPA process." *Burkholder v. Peters*, 58 F. App'x 94, 98 (6th Cir. 2003) (quoting *Ass'ns Working for Aurora's Residential Env't v. Colo. Dep't of Transp.*, 153 F.3d 1122, 1129 (10th Cir. 1998)). The Court can properly look to the level of oversight the federal agency provided in determining whether a breach or conflict of interest compromised the process. *Id.* Here, FHWA provided sufficient independent oversight to cure any rational hint of a potential or actual conflict caused by the contract. FHWA reviewed PennDOT's determinations, comments from consulting parties were sought throughout the entire Project development process, alternatives were considered, and supplemental analyses were ordered when needed. The Court concludes that any potential for the contract to have infected the NEPA process was controlled by FHWA's apparently conscientious oversight. *See id.* at 102 (holding that there was "no basis in the record to support appellants' assertion that their evidence of safer alternatives and serious environmental impacts was dismissed due to the bias of ODOT and its private contractor" and, if any such bias did exist, appellants could not "carry their burden of proof to show that the independent federal oversight provided by FHWA did not cure it").

Finally, Plaintiffs claim that the 2004 Technical Proposal Detail Report for the Urban Engineers contract states in the "Scope of Work" that the Report "will document that there are no

feasible or prudent alternatives to the use of Section 4(f) resources for this project." Pls.' Mot. for Summ. J. 13 (quoting AR-37 at 304). They claim that this shows that PennDOT predetermined that no feasible or prudent alternatives avoiding the use of Section 4(f) resources would be found.

PennDOT responds that the language Plaintiffs cite comes from a paragraph that begins, "If an Individual Section 4(f) Evaluation will be required . . . ." PennDOT's Reply 5. They explain that if a feasible and prudent alternative exists that would avoid impacts to Section 4(f) resources, then a Section 4(f) Evaluation would not be necessary. Therefore, they argue, the language in the Report simply reflects the fact that when a Section 4(f) Evaluation is completed it necessarily means that there is no feasible and prudent avoidance alternative, and the Evaluation—if determined to be necessary—would reflect that fact. The Court agrees that this is a logical explanation and does not find this section of the Report to be evidence of predetermination.

"[A]n agency can formulate a proposal or even identify a preferred course of action before completing [the NEPA process, and] Council on Environmental Quality [] regulations actually encourage identification of a preferred course of action during the NEPA process . . . ." *Ass'n of Pub. Agency Customers, Inc. v. Bonneville Power Admin.*, 126 F.3d 1158, 1185 (9th Cir. 1997). In resolving Plaintiffs' predetermination claim, the question posed to the Court boils down to whether Defendants committed to a particular result before the environmental consequences could be considered as an important part of the decision-making process. The contract here did not commit Defendants to a replacement, and indeed the record is laden with environmental consideration of multiple alternatives, including "no build" and various forms of rehabilitation.

For the reasons explained, the Court grants summary judgment to Defendants on Plaintiffs' predetermination claim.

**B.** **Whether 23 C.F.R. § 771.117(b) Prohibits the Issuance of a Categorical Exclusion**

Traditionally, an agency must prepare an "environmental impact statement" for any action that "significantly affect[s] the quality of the human environment." 42 U.S.C. § 4332(2)(C). If it is not certain that the proposed action will have that effect, the agency must prepare an "environmental assessment" to determine whether an environmental impact statement is needed. 40 C.F.R § 1508.9(a)(1).

However, there are some situations where even an environmental assessment is not necessary. These are called "categorical exclusions." Federal regulations promulgated by the Council on Environmental Quality define categorical exclusions as "a category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations [] and for which, therefore, neither an environmental assessment nor an environmental impact statement is required." 40 C.F.R. § 1508.4.

"[E]ach agency is responsible for developing criteria to determine the appropriate level of environmental review for different types of actions." *Friends of Pioneer St. Bridge*, 150 F. Supp. 2d at 650 (citing 40 C.F.R. § 1507.3(b)(2)). "The FHWA has thus created three classes of review—EIS, EA, and CE—each requiring different levels of documentation." *Id.* (citing 23 C.F.R. § 771.115).[21] The FHWA regulations define categorical exclusions as actions that "[d]o not induce significant impacts to planned growth or land use for the area; do not require the relocation of significant numbers of people; do not have a significant impact on any natural, cultural, recreational, historic or other resource; do not involve significant air, noise, or water quality

---

[21]     "EIS" stands for environmental impact statement, "EA" stands for environmental assessment, and "CE" stands for categorical exclusion.

impacts; do not have significant impacts on travel patterns; or do not otherwise, either individually or cumulatively, have any significant environmental impacts." 23 C.F.R. § 771.117(a).

There are two types of categorical exclusions under the FHWA regulations. The first type includes a list of actions under 23 C.F.R § 771.117(c) that meet the categorical exclusion criteria and generally do not require any further NEPA approvals. Included in this list of actions is, "Bridge rehabilitation, reconstruction, or replacement . . . if the actions meet the constraints in paragraph (e) of this section." 23 C.F.R § 771.117(c)(28).

Turning to the constraints under paragraph (e) of Section 771.117, a bridge rehabilitation, reconstruction, or replacement cannot be processed as a categorical exclusion if it involves, among other things, "[a] finding of 'adverse effect' to historic properties under the National Historic Preservation Act, the use of a resource protected under 23 U.S.C. 138 or 49 U.S.C. 303 (section 4(f)) except for actions resulting in de minimis impacts." 23 C.F.R. § 771.117(e)(3). Here, Defendants concluded that replacing the Bridge would result in an adverse effect to the Historic District, a Section 4(f) property. Therefore, because it does not meet the constraints of paragraph (e), the Project does not qualify as a categorical exclusion under 23 C.F.R § 771.117(c)(28).

However, the FHWA regulations allow for a second type of categorical exclusion. This second category includes those actions that meet the criteria for a categorical exclusion under 40 C.F.R. § 1508.4 and 23 C.F.R. § 771.117(a), and for which the applicant submits "documentation that demonstrates that the specific conditions or criteria for these [categorical exclusions] are satisfied, and that significant environmental effects will not result." 23 C.F.R. § 771.117(d). A nonexclusive list of examples of this type of categorical exclusion can be found under 23 C.F.R. § 771.117(d). These examples include "[a]ctions described in paragraphs (c)(26), (c)(27), and (c)(28) of this section that do not meet the constraints in paragraph (e) of this section." 23 C.F.R. § 771.117(d)(13). For the uninitiated, this means that bridge rehabilitations, reconstructions, or

replacements can proceed as a categorical exclusion under Section 771.117(d)(13), even if they do not meet the constraints of paragraph (e). Accordingly, the categorical exclusion in the present case was processed under Section 771.117(d)(13).

Finally, although categorical exclusions do not require either an environmental assessment or an environmental impact statement, if an action that would normally be classified as a categorical exclusion could involve "unusual circumstances," the FHWA must cooperate with the applicant (here, PennDOT) to conduct "appropriate environmental studies to determine if the [categorical exclusion] classification is proper." 23 C.F.R. § 771.117(b). These "unusual circumstances" include:

1. Significant environmental impacts;
2. Substantial controversy on environmental grounds;
3. Significant impact on properties protected by Section 4(f) requirements or Section 106 of the National Historic Preservation Act; or
4. Inconsistencies with any Federal, State, or local law, requirement or administrative determination relating to the environmental aspects of the action.

*Id.*

Here, Plaintiffs claim that the Project to replace the Bridge implicates all four "unusual circumstances" and Defendants failed to perform the appropriate environmental studies to determine if a categorical exclusion classification was proper, violating the mandates of NEPA.

### 1.  *Significant Environmental Impacts*

Plaintiffs claim that the Project is likely to have significant environmental impacts, precluding the issuance of a categorical exclusion under 23 C.F.R. 771.117(b)(1). They assert that the proposed bridge replacement could impact water quality, river hydraulics, and aquatic organisms. Plaintiffs acknowledge that similar impacts could occur during a rehabilitation project but claim that the impacts of a replacement will be greater due to a larger disturbance footprint.

Plaintiffs argue that the greatest threat to Tinicum Creek is fine sediment pollution, which can cause direct mortality, reduced reproductive success, and reductions in food. They claim that replacement increases the potential for greater sediment pollution loads during construction because it will create a greater disturbance of sediment compared to rehabilitation. Plaintiffs also argue that construction will impact physical habitats by encroaching onto the floodplain, damaging or destroying riparian areas, and compacting soil due to the heavy equipment. They believe that the impacts will continue past construction because the new, larger bridge surface will collect a variety of chemical pollutants from automobile traffic, de-icing salt, and storm water runoff. Because the presence of these contaminants in stream water has been positively correlated with traffic volume, Plaintiffs argue that a two-lane replacement will have a greater impact on the environment than the current one-lane Bridge.

Plaintiffs also claim that any changes to the Bridge may have hydrologic impacts and floodplain effects. They concede that "it is hard to say specifically what those impacts may be." Pls.' Mot. for Summ. J. 55. However, they argue that "it is safe to assume" that replacement will likely impact turbulence, velocity, streambed gradient, and water depths. Plaintiffs also claim that the Project will impact stream communities of macroinvertebrates and fish, and the current mitigation will not fully address the long-term hydrologic and biological consequences of construction. They argue that rehabilitating the Bridge would have less of an impact on the natural stream channel bottom, which would promote fish passage and avoid impacts to flow.

Plaintiffs assert that PennDOT's documented stream alignment concerns are not a valid reason to shift the Bridge because Tinicum Creek will continue to meander over time, so shifting the Bridge will not solve the problem. They claim that "Natural Channel Design" could be used upstream of the Bridge to guide the Creek towards the openings in the existing Bridge. Finally,

Plaintiffs argue that no substantial site work proposal was presented, and PennDOT provided no substantial information on the proposed site features and site disturbances, hindering public review and comment due to a lack of information.

Defendants respond that numerous studies in the record reached different conclusions from those Plaintiffs promote regarding the impacts that the Project will have on the environment, making Plaintiffs' arguments nothing more than a battle of the experts. PennDOT also argues that Defendants considered the reports and comments that Plaintiffs submitted throughout the Project's development and responded to many of Plaintiffs' comments. Defendants assert that because there was substantial public interest in the Project, they conducted a more extensive alternatives analysis than is ordinarily pursued for a categorical exclusion. They argue that even though these actions were not required under NEPA, Defendants provided a draft categorical exclusion evaluation for a 45-day public comment period and held a public hearing to receive comments on the evaluation. Defendants also considered and addressed comments from consulting parties, which included Plaintiffs, during the Section 106 process.

Indeed, the Court's review of the record reveals that Plaintiffs submitted comments to the draft categorical exclusion evaluation that are substantially similar, and at many points identical, to the arguments raised in their summary judgment briefing. *See* AR-24 at 236–303. Defendants provided detailed responses to the concerns Plaintiffs presented. *Id.* at 38-46. The full comment response document, which included approximately 45 pages of responses, addressed various comments received on the draft categorical exclusion evaluation. *Id.* at 7–52. The Court will not quote those extensive responses here. However, some relevant takeaways include that the preliminary hydrologic and hydraulic analysis determined that increases to water surface elevations and velocities downstream would be insignificant and are not anticipated to result in

any downstream impacts; that long-term impacts from sediment are not anticipated, and the Project

will minimize temporary impacts by implementing an approved erosion and sedimentation control

plan; that the proposed replacement bridge will not result in any new point source for discharge

into the Creek, the widening will increase stormwater runoff but not cause a significant impact to

the Creek, and the design will incorporate vegetated swales in addition to rip-rap to provide a

buffer for water; and although temporary impacts to aquatic life are anticipated, fish passage will

be improved by removing a pier, the scour protection will be choked with natural streambed

materials to encourage the recolonization of macroinvertebrates and finish, and recolonization is

anticipated to occur soon after the close of construction.

Despite Plaintiffs' arguments to the contrary, the record is filled with evidence that

Defendants considered the Project's environmental impacts and performed appropriate studies to

determine whether a categorical exclusion was proper.  The fact that Plaintiffs submitted contrary

evidence and assume that significant effects will result does not mandate a different result:

> An agency is entitled to select any reasonable methodology and to resolve conflicts
> in expert opinion and studies in its best reasoned judgment based on the evidence
> before it.  *See Hughes River Watershed v. Johnson*, 165 F.3d 283, 289–90 (4th Cir.
> 1999); *Oregon Environmental Council v. Kunzman*, 817 F.2d 484, 496 (9th Cir.
> 1987).  As a practical matter, were it otherwise, virtually every agency action
> involving expertise or technical analyses could be obstructed by a party who
> engaged an expert willing to disagree with the views or conclusions of the experts
> utilized by the agency.

*Buckingham Twp.*, 157 F. Supp. 2d at 467 n.10; *see also Marsh v. Or. Nat. Res. Council*, 490 U.S.

360, 378 (1989) ("When specialists express conflicting views, an agency must have discretion to

rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court

might find contrary views more persuasive.").

The record supports a finding that Defendants evaluated the potential environmental

impacts and determined, based on studies and additional evidence, that significant environmental

impacts would not result.   Because Defendants took the "hard look" at environmental consequences as required under NEPA, the Court concludes that 23 C.F.R. 771.117(b)(1) does not render the approval of a categorical exclusion arbitrary, capricious, or otherwise not in accordance with law.

>2.   *Substantial Controversy on Environmental Grounds*

Next, Plaintiffs assert that the Project results in a substantial controversy on environmental grounds, precluding the issuance of a categorical exclusion.   FHWA concedes that a substantial controversy on environmental grounds exists.   *See* FHWA Mot. for Summ. J. 12 ("The Government readily acknowledges that the Bridge Project has been the subject of a vigorous controversy for close to fifteen years."); Nov. 1, 2019 Oral Arg. Tr. 24:24–25:2 ("Q: [H]ow do the defendants say that this matter is not involving a substantial controversy on environmental grounds?  A: Oh, it does, Your Honor, it does.").   Even the Final Categorical Exclusion Evaluation for the Project answered "Yes" to the question, "Will the project involve substantial controversy concerning social, cultural, or natural resource impacts?" under the larger heading of "Public Controversy on Environmental Grounds."[22]   AR-26 at 81.   Defendants argue, however, that the presence of such a controversy does not, in and of itself, preclude the issuance of a categorical exclusion.

The plain language of Section 771.117(b)(2) supports Defendants' view.   Under Section 771.117(b)(2), an action that could involve unusual circumstances merely requires FHWA to

---

[22]    This concession does call into question the Final Categorical Exclusion Evaluation's conclusion that the Project would not result in any of the four unusual circumstances under 23 C.F.R. 771.117(b).  AR-26 at 97.  However, as explained in the remainder of this section, that an unusual circumstance may exist does not in itself render the approval of a categorical exclusion improper.  Nor does an error, such as the Evaluation's statement regarding the presence of an unusual circumstance, require remand where it is harmless and had no impact on the final outcome, as is the case here.  *See United States v. Coal. for Buzzards Bay*, 644 F.3d 26, 37 (1st Cir. 2011) ("Assuredly, NEPA violations are subject to harmless error review.").

conduct "appropriate environmental studies to determine if the [categorical exclusion] classification is proper."  This necessarily means that an action presenting unusual circumstances can still be classified as a categorical exclusion.  It also means that the presence of unusual circumstances does not automatically trigger the need for an environmental assessment or environmental impact statement because, by definition, a categorical exclusion does not require an environmental assessment or environmental impact statement, and the statute's plain language only requires "appropriate environmental studies."  *See Highway J Citizens Grp. v. U.S. Dep't of Transp.*, 891 F.3d 697, 701 (7th Cir. 2018) ("Section 771.117(b) does not require an environmental impact statement whenever someone opposes a project; it requires only 'appropriate environmental studies.'").

The fact that a substantial controversy on environmental grounds exists did not disqualify FHWA from issuing a categorical exclusion for the Project.  However, the regulations do require that "appropriate environmental studies" were performed to address this controversy.  Here, Defendants met with the permitting agencies and produced both an original and updated hydrologic and hydraulic study of the Project alternatives, an Existing Structure Condition Evaluation Report, a Core Drilling Investigation Report, and a Bridge Width Evaluation. Defendants also encouraged meaningful public involvement by making the draft categorical exclusion evaluation, as well as many other reports, available for public review and comment, and multiple public hearings were held even though "there is no requirement that public hearings be held when a project has been classified as a CE."  *Friends of Pioneer St. Bridge*, 150 F. Supp. 2d at 652.

Plaintiffs have been actively involved throughout the Project's development, including as Section 106 consulting parties.  As noted above, Plaintiffs provided extensive comments on the

draft categorical exclusion evaluation, raising many of the same NEPA arguments they rely on now in their summary judgment papers.  Having reviewed Defendants' detailed and thoughtful responses to Plaintiffs' comments, the Court will not conclude that Defendants failed to take a "hard look" at the potential environmental impacts of the Project or that they failed to respond appropriately to the substantial controversy that arose.  Plaintiffs' earnest good faith persistent disagreement, and even their experts' disagreement, with the final outcome does not render Defendants' determinations arbitrary or capricious.  Accordingly, the Court finds that the existence of a substantial controversy on environmental grounds does not prohibit the issuance of a categorical exclusion for the Project.

### 3.    Significant Impact on 4(f) or National Historic Preservation Act Properties

Plaintiffs next proclaim that the Project will significantly impact various Section 4(f) properties, making a categorical exclusion improper under 23 C.F.R. 771.117(b)(3).  First, Plaintiffs state that the Project will destroy the Bridge, which they argue is itself a Section 4(f) property and is also protected under the National Historic Preservation Act.  Next, Plaintiffs contend that even if the Bridge itself is not a Section 4(f) property, its destruction will significantly harm the Historic District, which is undisputedly a Section 4(f) property.  Finally, Plaintiffs assert that Tinicum Creek is a Section 4(f) resource that will be significantly harmed by the Project.

### c.    The Bridge

Section 4(f) applies to "historic sites on or eligible for the National Register."  23 C.F.R. § 774.11(e).  "In determining the applicability of Section 4(f) to historic sites, the [FHWA], in cooperation with the applicant, will consult with the official(s) with jurisdiction to identify all properties on or eligible for the National Register of Historic Places (National Register)."  *Id.* "[T]he Keeper has been held to have independent authority to determine whether a property should be listed in the National Register."  *Friends of the Atglen-Susquehanna Trail, Inc. v. Surface*

*Transp. Bd.*, 252 F.3d 246, 264 (3d Cir. 2001) (citing *Moody Hill Farms Ltd. P'ship v. U.S. Dep't of the Interior, Nat'l Parks Serv.*, 205 F.3d 554, 558 (2d Cir. 1999)).

Here, the Keeper of the National Register was asked in 2006 to determine whether the Bridge was eligible for the National Register either as an individual property or as a contributing resource to the Historic District.  AR-39 at 207–08.  In its evaluation, the Keeper found that:

> The Headquarters Road Bridge was listed in the National Register of Historic Places on July 24, 1992, as a contributing property in the Ridge Valley Rural Historic District, Bucks County, Pennsylvania.  The bridge consists of early 19th century stone abutments and piers carrying an early 20th century replacement concrete deck supported on concrete-encased steel I beams.  Both its original construction and alteration occurred within the historic district's defined Period of Significance (1790–1940).  The bridge is historically significant in the context of the development of the township, regional transportation, and the operation of local mills, and is of engineering significance both for its early 19th century construction and its sensitive modernization in 1919.  Although the concrete deck shows signs of considerable deterioration and the deck has been altered with the removal of the 1919 railings, the bridge retains sufficient historic integrity to continue to contribute to the Ridge Valley Rural Historic District.

AR-4 at 2.  The Keeper concluded that the "Bridge is eligible for the National Register of Historic Places as a contributing property in the National Register-listed Ridge Valley Rural Historic District."  *Id.* at 1.

Defendants integrated the Keeper's eligibility determination into the Section 106 process under the National Historic Preservation Act.  They apprised the Section 106 consulting parties of the Bridge's eligibility status, and the consulting parties were aware of the Bridge's eligibility when completing each of the Section 106 stages, including identifying any historic properties in the Project's area of potential effects.

Under Section 106, a determination must also be made whether there will be any adverse effects on historic properties present in the Project area.  36 C.F.R. § 800.5.  If an adverse effect is determined, then Defendants must consult with the Section 106 consulting parties "to develop and evaluate alternatives or modifications to the undertaking that could avoid, minimize, or mitigate

adverse effects on historic properties." 36 C.F.R. § 800.6(a).  If "the agency official and the [State Historic Preservation Officer] agree on how the adverse effects will be resolved, they shall execute a memorandum of agreement."   36 C.F.R. § 800.6(b)(1)(iv).  "A memorandum of agreement executed and implemented pursuant to [36 C.F.R. § 800.6] evidences the agency official's compliance with section 106 and this part and shall govern the undertaking and all of its parts.  36 C.F.R. § 800.6(c).

Here, Defendants executed a Memorandum of Agreement with the ACHP and the PaSHPO.[23]  In the Memorandum of Agreement, the parties stated that FHWA determined, in consultation with the PaSHPO, that the Bridge is eligible for inclusion in the National Register as a contributing resource to the Historic District, which is listed in the National Register.  AR-26 at 52.  The only adverse effect determined by the Section 106 process and listed in the Memorandum of Agreement was an adverse effect on the Historic District due to the demolition of the Bridge as a contributing element.  *Id.*  The Memorandum of Agreement set forth the agreed upon mitigation measures to resolve the adverse effect on the Historic District and stated that its execution demonstrates that FHWA took into account the effects of the Project on historic properties.

Here, Plaintiffs have not challenged Defendants' Section 106 process or conclusions.  To the extent that they may have made any arguments or statements calling such findings into question, these arguments are insufficient because the complaint unequivocally does not state a claim under Section 106 of the National Historic Preservation Act.  Plaintiffs only challenge Defendants' categorical exclusion and Section 4(f) evaluation.  Accordingly, the Court will not revisit the determinations arising directly from the Section 106 process and will instead incorporate these determinations into the larger analysis.

---

[23]      A reminder may prove helpful that "ACHP" and "PaSHPO" refer to the Advisory Council on Historic Preservation and the Pennsylvania State Historic Preservation Officer.

Perhaps unsurprisingly, there is a scarcity of case law addressing the intersection between Section 4(f), independently eligible structures, contributing elements, and how those pieces fit together in the greater context of categorical exclusions.  In such circumstances, and in a context such as this, administrative materials can prove illuminating, if not controlling.  Here, a 2013 NEPA and NHPA Handbook from the Council on Environmental Quality, the Executive Office of the President, and the ACHP provides:

> The majority of Federal actions reviewed under NEPA qualify for a CE. . . .  If the proposed action is a type of undertaking with the potential to affect historic properties, the agency initiates the Section 106 consultation process by identifying the appropriate SHPO/THPO and other parties with an interest in the effects of the undertaking on historic properties, and consults to determine the area of potential effects, and the scope of identification efforts, consistent with 36 C.F.R. Part 800.  The Section 106 consultation can assist an agency in determining whether "extraordinary circumstances" related to historic properties are present.  "Extraordinary circumstances," in which a normally excluded action may have a significant environmental effect, typically consider the "degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources." . . . [I]f an agency determines there may be adverse effects to historic properties, it must consider whether the adverse effects constitute "extraordinary circumstances" that merit further analysis in an EA or EIS, either alone or in combination with other environmental effects.  ***When the agency resolves the adverse effects to historic properties through the Section 106 process by avoiding, minimizing, or mitigating them such that the potential adverse effects no longer constitute "extraordinary circumstances," it may still meet its NEPA responsibilities through a CE.***  The agency documents the Section 106 analysis to support the application of the CE, and the Section 106 analysis should be completed before or concurrent with the use of a CE.

COUNCIL ON ENVIRONMENTAL QUALITY, EXECUTIVE OFFICE OF THE PRESIDENT, AND ADVISORY COUNCIL ON HISTORIC PRESERVATION, NEPA AND NHPA: A HANDBOOK FOR INTEGRATING NEPA AND SECTION 106, 18–19 (Mar. 2013), https://www.achp.gov/sites/default/files/2017-02/NEPA_NHPA_Section_106_Handbook_Mar2013_0.pdf (emphasis added).

Here, the statutorily required parties with the appropriate expertise evaluated the presence of historic properties (the Historic District, the Bridge, and surrounding parcels), the effect of the

Project to those properties (an adverse effect to the Historic District), and entered into a Memorandum of Agreement stating how the adverse effect could and would be resolved.  The Memorandum of Agreement set forth mitigation measures to resolve the adverse effect to the Historic District, considering the Bridge in the greater context of the Historic District.  Carrying these conclusions forward from the Section 106 process into the Final Categorical Exclusion Evaluation, Defendants operated under the understanding that the Project's adverse effects were properly mitigated.  It was not arbitrary or capricious for the agencies to rely upon the unchallenged findings of the Section 106 process in determining that the adverse effects were appropriately mitigated and, therefore, significant impacts to the relevant historic properties would not result, qualifying the Project for a categorical exclusion.  *See id.* at 19 ("When the agency resolves the adverse effects to historic properties through the Section 106 process by avoiding, minimizing, or mitigating them such that the potential adverse effects no longer constitute 'extraordinary circumstances,' it may still meet its NEPA responsibilities through a CE.").

Furthermore, Defendants argue that other courts have found that FHWA approval of a categorical exclusion was not arbitrary and capricious even where the project at issue would result in the destruction of an individually eligible Section 4(f) property, not just a contributing resource. *See, e.g.*, *Concerned Citizens of Chappaqua v. U.S. Dep't of Transp.*, 579 F. Supp. 2d 427, 434 (S.D.N.Y. 2008) (finding that plaintiffs had not demonstrated a likelihood of prevailing on their NEPA claim because the administrative record provided a sufficient basis for the court to find that the agencies were not arbitrary or capricious in concluding that the project to replace a National Register-eligible bridge met the conditions of a categorical exclusion); *Van Raden v. City of Portland*, No. 01-233, 2001 WL 34047031, at *6 (D. Or. May 31, 2001) (holding that plaintiffs were not likely to prevail because defendants had evaluated the historical significance of a National

Register-eligible building and the record supported their conclusion that its destruction did not constitute a significant environmental effect under the regulations).

Plaintiffs argue that Defendants' reliance on *Chappaqua* and *Van Raden* is misplaced. First, they urge that both cases are inapplicable because their procedural posture was on a motion for a preliminary injunction, not summary judgment.  Second, they claim that the Section 4(f) mitigation measures present in *Chappaqua* were focused on mitigating the loss of the bridge, and the Memorandum of Agreement specifically accounted for "a full documentary and photographic preservation of the property to be sent to the State Archives."  *Concerned Citizens of Chappaqua*, 579 F. Supp. 2d at 435.  Plaintiffs also argue that the Memorandum of Agreement in *Chappaqua* required the use of construction materials that would mimic the design and detailing of many of the historic bridge's features, and elements of the bridge would be salvaged from the existing bridge.  Plaintiffs contend that "there is no similar commitment to preserving or documenting the historical significance of the Bridge" for the case at hand.  Pls.' Mot. for Summ. J. 23.  They argue that *Van Raden* is similarly inapplicable because the historic preservation analysis focused on preserving and documenting the building at issue, but here the mitigation measures are focused on the Historic District, not the Bridge.

First, addressing the usefulness of the preliminary injunction cases, that the standard of review for a motion for a preliminary injunction is different from that for a motion for summary judgment does not render the analysis useless.  A motion for a preliminary injunction requires a court to analyze the moving party's likelihood of success on the merits.  This merits analysis tracks the analysis applied during a motion for summary judgment when undertaken in the context of an administrative review.  Therefore, analyses focused on the likelihood of success on the merits can provide relevant authority.

Second, turning to Plaintiffs' contentions regarding the differences in mitigation measures between the cases cited and the case at hand, the Court's own review of the record reluctantly leads to a different conclusion. Although the Memorandum of Agreement in the instant matter is framed around the Historic District, it includes several mitigation measures that are focused on the historic nature of the Bridge itself. A number of these mitigation measures are comparable to those in *Chappaqua*. For example, the Memorandum of Agreement requires in part that PennDOT will, at a minimum, "salvage stone from the existing structure's masonry components for use in the proposed 2 lane concrete structure," will use a stone mason with relevant experience to use the salvaged stone in a way that "should closely match, to the extent possible, the orientation and layout of existing stone," and will retain and incorporate the existing Bridge's plaque into the new bridge. AR-26 at 53–54. The Memorandum of Agreement also states that "PennDOT will complete measured drawings of the Headquarters Road Bridge" that "will be provided to the signatory parties and offered to the Library of Congress Historic American Engineering Record." *Id.* at 54. PennDOT will also "develop and construct a physical display, or content for web publication, on the history and historic significance of the Ridge Valley Rural Historic District, *including information on the Headquarters Road Bridge over Tinicum Creek*, a contributing component of this historic district." *Id.* (emphasis added). These mitigation measures directly address the impacts to the Bridge and present a historically and contextually sensitive design. *Cf. River Fields, Inc. v. Peters*, No. 08-264, 2009 WL 2222901, at *7 (W.D. Ky. July 23, 2009) (noting in upholding FHWA's use of a categorical exclusion for a project widening a bridge that was both individually eligible for the National Register and a contributing element to a broader historic district that "[t]he MOA provides, in pertinent part, that the reconstructed Bridge will mimic the

original in its appearance and materials, and vegetation that is removed will be replaced in accordance with a landscape plan").

Defendants engaged with the consulting parties throughout the Section 106 process to identify historic properties and mitigate the effects on them. That process determined that replacing the Bridge would cause an adverse effect to the Historic District, but Defendants undertook all possible planning to minimize those harms through the terms in the Memorandum of Agreement. The agreed upon mitigation measures include terms that will minimize the harm to the Bridge as well. Plaintiffs do not challenge the Section 106 process here. It was not arbitrary and capricious for Defendants to rely on the results of that process in determining that adverse effects to the identified historic properties were mitigated and significant environmental impacts would not result. This conclusion is further supported by the fact that courts have held that a categorical exclusion may be proper even where an individually eligible Section 4(f) resource will be replaced or destroyed. The record is filled with evidence of inter-agency coordination, public involvement, and the study and consideration of environmental impacts, indeed well beyond that usually seen or required for a categorical exclusion. The Court holds that the alleged impacts to the Bridge do not make the approval of a categorical exclusion arbitrary and capricious under Section 771.117(b)(3).

> d.    The Historic District

Plaintiffs also argue that even if the Bridge is not a standalone Section 4(f) property, replacing the Bride will significantly harm the Historic District. First, Plaintiffs cite a series of views held by architectural historian and professor Robert Reynolds voicing the critical role of the Bridge to the Historic District. Next, they claim that replacing the oldest remaining example of a single lane pier-to-pier bridge in Pennsylvania, which is one of only six bridges that are contributing resources to the Historic District, "would forever leave a gaping hole in the formerly

complete collection of historic bridge types contained in Tinicum Township . . . and would forever alter one of the primary factors contributing the [sic] historic district's classification." Pls.' Mot. for Summ. J. 26–27. Plaintiffs also argue that Defendants admit that replacing the Bridge will have an adverse effect on the Historic District, further suggesting that the impact is significant.

There is no dispute that Defendants found that replacing the Bridge will cause an adverse effect to the Historic District. Lamentable as it is for our overall environment to lose or curtail elements of charm, prior human accomplishments, features of a "simpler era" or any other way one might describe the demands of progress, safety, improved standards or inevitable change, the fact remains that there are frameworks for authorizing the losses. In this dispute, involving this Bridge, it is well established that an adverse effect is not synonymous with a significant impact. *See Friends of Pioneer St. Bridge*, 150 F. Supp. 2d at 653 ("[A] mere finding of 'adverse effect' on a 4(f) property (especially where, as here, the agency has provided for mitigation of that adverse effect) is insufficient to support the conclusion that the project will 'significantly impact' a 4(f) property."); *see also Nw. Envtl. Def. Ctr. v. U.S. Army Corps of Engineers*, 817 F. Supp. 2d 1290, 1311 (D. Or. 2011) ("Here, the Corps reasonably concluded that although the project may have adverse effects to individual coho salmon and elements of their habitat, the RGP would not result in significant impacts to the species.").

Here, the Memorandum of Agreement demonstrates that Defendants and the PaSHPO agreed "on how the adverse effects [to the Historic District] will be resolved," 36 C.F.R. § 800.6(b)(1)(iv), and sets forth the agreed upon mitigation measures. FHWA's determination that there is no significant impact to the Historic District is entitled to substantial deference and is supported by the mitigation measures contained in the Memorandum of Agreement. Accordingly,

Plaintiffs arguments that the Project will cause significant impacts to the Historic District do not provide a basis for the Court to hold Defendants' actions arbitrary or capricious.

> e.    Tinicum Creek

Plaintiffs also argue that Tinicum Creek is a Section 4(f) property that will be significantly impacted by the Project.  In support of their argument that the Creek is a Section 4(f) resource, the Plaintiffs rely on an "official reply" to PennDOT and FHWA from the NPS stating:

> The fact that Tinicum Creek is surrounded by the Ridge Valley Rural National Historic District (NHD) and that the Headquarters Road has been determined by the Keeper of the National Register (2006) to be a contributing resource of the Ridge Valley Rural NHD is sufficient to designate this project and Tinicum Creek Wild and Scenic River under FHA 4F.

AR-51 at 1469.  In reporting its conclusion, the NPS cited FHWA's Section 4(f) Policy Paper, the relevant section of which stated:

> Within a [National Register] listed or eligible historic district, FHWA's long-standing policy is that Section 4(f) applies to those properties that are considered contributing to the eligibility of the historic district, as well as any individually eligible property within the district.  Elements within the boundaries of a historic district are assumed to contribute, unless they are determined by FHWA in consultation with the SHPO/THPO not to contribute.

*Id.*

In responding to the NPS, an Environmental Protection Specialist for FHWA stated that "FHWA and PennDOT respectfully disagree with the National Park Service (NPS) position regarding Tinicum Creek as a Section 4(f) resource due to its association with the [Historic District.]"  *Id.* at 1537.  In so concluding, FHWA explained that the National Register Registration Form for the Historic District did not specifically reference Tinicum Creek as a contributing element to the Historic District.  *Id.*  Additionally, FHWA noted that guidance from the NPS stated that natural waterways are generally not considered eligible resources for the National Register.

*Id.*  Specifically, the NPS's "National Register Bulletin: How to Apply the National Register Criteria for Evaluation" states:

> A site may be a natural landmark strongly associated with significant prehistoric or historic events or patterns of events, if the significance of the natural feature is well documented through scholarly research.  Generally, though, the National Register excludes from the definition of "site" natural waterways or bodies of water that served as determinants in the location of communities or were significant in the locality's subsequent economic development.  While they may have been "avenues of exploration," the features most appropriate to document this significance are the properties built in association with the waterways.

AR-30 at 515.

Plaintiffs claim that while natural waters are "generally" excluded from the definition of "site," they are not absolutely excluded, and Defendants ignored the analysis of the NPS recommending that Tinicum Creek should be designated as a Section 4(f) resource.  Although Plaintiffs are correct that natural waters are not absolutely excluded from Section 4(f) protection, *see, e.g.*, 23 C.F.R. § 774.17 ("In the case of portions of Wild and Scenic Rivers to which Section 4(f) applies . . . ."), the record shows that Defendants did not ignore the NPS's conclusion and recommendation.  Rather, FHWA took the NPS's recommendation under consideration and provided a thorough reply explaining its disagreement and providing the basis for that disagreement.

In light of this reasoned review and response, the Court will not conclude that Defendants ignored or completely failed to consider the NPS's recommendation, or that Defendants' conclusion that Tinicum Creek is not a Section 4(f) resource was arbitrary or capricious.  Because the Court is obliged to defer to Defendants' conclusion that the Creek is not a Section 4(f) resource, impacts to the Creek do not trigger unusual circumstances under Section 771.117(b)(3).

### 4.      Inconsistencies with Federal, State, or Local Laws

Finally, the complaint alleges that the Project is likely to result in various inconsistencies with federal, state, or local laws.  They assert that the Project cannot comply with (1) state laws 25 Pa. Code §§ 105.161, 105.165, and 93.4a; (2) Section 7 of the Wild and Scenic Rivers Act; and (3) the Department of Transportation Act.

PennDOT asserts that after the rehabilitation alternative did not appear prudent, it scheduled permit pre-application meetings with PaDEP, the United States Army Corps of Engineers, NPS, and the Pennsylvania Historical and Museum Commission to determine acceptable design criteria for a replacement bridge.  PaDEP opposed a three-span replacement and requested that the design minimize encroachments into the stream, improve the movement and migration of aquatic species, locate abutments outside the normal stream banks, and improve the existing conditions of the stream.  PaDEP later accepted the recommendation to construct a two-lane, two-span replacement bridge.

FHWA argues that NPS has represented that it does not yet have sufficient evidence regarding compliance with Section 7 of the Wild and Scenic Rivers Act, but will provide a final determination once the Project is in final review form.  NPS has also stated that the Memorandum of Agreement and proposed design of the replacement bridge represent an appropriate effort to minimize impacts to the Historic District.

PennDOT also states that PaDEP, the United States Army Corps of Engineers, and NPS all participated in the Section 106 consulting party meetings and were given the opportunity to review and comment on the draft categorical exclusion evaluation.  It is undisputed that the permitting agencies' comments did not include any inconsistencies with state or federal laws.

Plaintiffs do not meet Defendants' arguments in their summary judgment papers, but rest on the allegations in the complaint. Plaintiffs have not identified evidence in the record demonstrating that the Project is likely to violate state or federal laws. Defendants have presented evidence that the permitting agencies have not identified any inconsistencies with state or federal laws. Plaintiffs' claim repeatedly states that the Project "is likely to" cause various inconsistencies, but coordination with the relevant agencies regarding compliance is ongoing, and the Court cannot deem Defendants' actions arbitrary or capricious based upon a hypothetical possibility of an inconsistency, especially where, as detailed above, Defendants engaged in extensive environmental review and performed appropriate studies to determine that a categorical exclusion was proper. The Court grants summary judgment in favor of Defendants on this final "unusual circumstances" claim.

### C. Whether 23 C.F.R. § 771.117(e) Prohibits the Issuance of a Categorical Exclusion

Plaintiffs next claim that Section 771.117(e) of the FHWA regulations prohibits Defendants from issuing a categorical exclusion. As described, Section 771.117(e) places limitations on the use of categorical exclusions for actions listed in Sections 771.117(c)(26)–(28). Specifically, an action described in Sections 771.117(c)(26)–(28) cannot be processed as a categorical exclusion if it involves:

> (1) An acquisition of more than a minor amount of right-of-way or that would result in any residential or non-residential displacements;
> (2) An action that needs a bridge permit from the U.S. Coast Guard, or an action that does not meet the terms and conditions of a U.S. Army Corps of Engineers nationwide or general permit under section 404 of the Clean Water Act and/or section 10 of the Rivers and Harbors Act of 1899;
> (3) A finding of "adverse effect" to historic properties under the National Historic Preservation Act, the use of a resource protected under 23 U.S.C. 138 or 49 U.S.C. 303 (section 4(f)) except for actions resulting in de minimis impacts, or a finding of "may affect, likely to adversely affect" threatened or endangered species or critical habitat under the Endangered Species Act;

(4) Construction of temporary access or the closure of existing road, bridge, or ramps that would result in major traffic disruptions;

(5) Changes in access control;

(6) A floodplain encroachment other than functionally dependent uses (e.g., bridges, wetlands) or actions that facilitate open space use (e.g., recreational trails, bicycle and pedestrian paths); or construction activities in, across or adjacent to a river component designated or proposed for inclusion in the National System of Wild and Scenic Rivers.

23 C.F.R. § 771.117(e)(1)–(6).

Plaintiffs argue that the Project at issue here is a "[b]ridge rehabilitation, reconstruction, or replacement" as described in Section 771.117(c)(28), meaning it can only proceed as a categorical exclusion if it does not involve any of the circumstances listed in Section 771.117(e). They claim that the Project will likely require a permit from the United States Army Corps of Engineers, will have an adverse effect on the Historic District under the National Historic Preservation Act, and will involve construction activities in Wild and Scenic Tinicum Creek, implicating Sections 771.117(e)(2), (3), and (6). Therefore, Plaintiffs assert that the Project cannot be processed as a categorical exclusion.

Plaintiffs' arguments, though at first blush, intriguing, neglect a key regulatory detail: the limitations in Section 771.117(e) are only triggered when an action is proceeding under Section 771.117(c)(26), (c)(27), or (c)(28). Here, the Project was processed as a categorical exclusion under Section 771.117(d)(13), which permits actions that would not meet the constraints of Section 771.117(e) to nonetheless be processed as categorical exclusions after the applicant "submit[s] documentation that demonstrates that the specific conditions or criteria for [the categorical exclusion are] satisfied, and that significant environmental effects will not result." 23 C.F.R. § 771.117(d). Indeed, Defendants do not dispute that the Project would fail to meet the requirements of Section 771.117(e). They claim that this is why PennDOT applied for a categorical exclusion under Section 771.117(d)(13) instead of Section 771.117(c).

Because PennDOT proceeded under Section 771.117(d), not Section 771.117(c), there is no basis upon which to apply the limitations of Section 771.117(e).  Accordingly, Section 771.117(e) does not prohibit issuing a categorical exclusion, and this must lead the Court to grant summary judgment on this claim in favor of Defendants.

D.     **Whether 23 C.F.R. § 771.117(a) Prohibits the Issuance of a Categorical Exclusion**

23 C.F.R. § 771.117(a) defines categorical exclusions as "actions that meet the definition contained in 40 CFR 1508.4, and, based on FHWA's past experience with similar actions, do not involve significant environmental impacts."  For the same reasons that Plaintiffs' other categorical exclusion challenges have not entitled Plaintiffs to relief, this "catchall" claim also fails.

Unfortunately for all, the Bridge is decrepit and its function severely limited.  Defendants determined that a need existed and sought to develop a Project to address that need.  It is clear that the process has resulted in controversy and vigorous debate.  Indeed, the Bridge and the Creek have been so beset with litigation and other machinations over the many years, it is a natural wonder that words have not dammed [sic] the Creek altogether, rendering a bridge unnecessary. However, the nearly 14,000-page record also demonstrates that Defendants have endeavored to research and respond to these areas of contention.  Although the Bridge, which does have historic value as a contributing element to the Historic District, will be replaced, the agencies determined over the course of 15 years of studies, reports, comments, responses, and coordination, as well as their own expertise, that a categorical exclusion was appropriate because significant impacts to the human environment would not result.  Considering the evidence presented, and emphasizing that agencies are entitled to substantial deference in interpreting their own regulations and determining the applicability of a categorical exclusion, the Court concludes that approving a categorical exclusion was not arbitrary, capricious, or otherwise not in accordance with law.  The Court grants summary judgment in favor of Defendants.

E.   **Whether Defendants' Failure to Generate an Environmental Assessment was Arbitrary, Capricious, or Otherwise Not in Accordance with Law**

With their final NEPA claim, Plaintiffs assert that an environmental assessment was necessary because the Project did not qualify as a categorical exclusion, making Defendants' failure to generate such an assessment arbitrary and capricious.

For the reasons already explained, the Court has concluded that Defendants did not act improperly in qualifying the Project as a categorical exclusion. Categorical exclusions are actions where "neither an environmental assessment nor an environmental impact statement is required." 40 C.F.R. § 1508.4. Accordingly, by logical extension, Defendants did not act arbitrarily or capriciously in not generating an environmental assessment. Summary judgment is granted in favor of Defendants on each of Plaintiffs' NEPA claims.

## II.   **The Department of Transportation Act**

Plaintiffs also assert two claims arising out of the Project's Final Section 4(f) Evaluation. Section 4(f) of the Department of Transportation Act mandates that the Secretary cannot approve a project requiring "the use of any publicly owned land from a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance . . . , or any land from an historic site of national, State, or local significance" unless "(1) there is no feasible and prudent alternative to the use of such land, and (2) such program includes all possible planning to minimize harm to such park, recreational area, wildlife and waterfowl refuge, or historic site resulting from such use." 23 U.S.C. § 138(a).

When a plaintiff challenges a determination under Section 4(f), "the plaintiff bears the burden of showing by a preponderance of the evidence that the Secretary acted improperly in approving the use of protected property." *Concerned Citizens All., Inc. v. Slater*, 176 F.3d 686, 694 (3d Cir. 1999) (citing *Ringsred v. Dole*, 828 F.2d 1300, 1302 (8th Cir. 1987)). The Secretary's

65

decision receives "a presumption of regularity," but the Court must perform a "'probing, in-depth' review" and "decide whether the Secretary's ultimate decision was arbitrary, capricious, or an abuse of discretion." *Id.* (quoting *Overton Park*, 401 U.S. at 415).

A.   **Whether Defendants' Purpose and Need Determination in the Final Section 4(f) Evaluation was Arbitrary, Capricious, or Otherwise Not in Accordance with Law**

In Count VI of their complaint, Plaintiffs allege that the Project's purpose and need statement in the Final Section 4(f) Evaluation was improper.  Here, Plaintiffs raise the same arguments that they relied upon in their claim that Defendants' purpose and need statement in the Final Categorical Exclusion Evaluation was improper.  The Court analyzed these arguments in Section I(A), *supra*, and need not repeat that analysis.  For the same reasons the Court granted summary judgment in favor of Defendants on Plaintiffs' earlier claim, it grants summary judgment in favor of Defendants here.

B.   **Whether Defendants Failed to Choose a Prudent and Feasible Alternative**

Section 4(f)(1) does not permit the Secretary to approve a project if there is a feasible and prudent alternative that completely avoids "the use of any publicly owned land from a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance . . . , or any land from an historic site of national, State, or local significance." 23 U.S.C. § 138(a).  Here, Defendants evaluated two alternatives that would avoid the use of Section 4(f) resources: (1) the "no build" option; and (2) Alternative 1, which would involve constructing a new roadway that totally avoids the Historic District.  Plaintiffs do not claim that Defendants should have selected one of those options.  Rather, Plaintiffs assert that rehabilitation of the Bridge was a prudent and feasible alternative that Defendants impermissibly failed to select.  Because rehabilitation would result in a Section 106 adverse effect to the Historic District and constitute a "use" under Section 4(f), Section 4(f)(1) does not compel its selection even if it were prudent and feasible.

The pertinent question instead turns on Section 4(f)(2), which requires that the Project "includes all possible planning to minimize harm to such park, recreational area, wildlife and waterfowl refuge, or historic site resulting from such use." 23 U.S.C. § 138(a). However, even "an alternative that minimizes harm under Section 4(f)(2) can still be rejected if that alternative is infeasible or imprudent." *Concerned Citizens All.*, 176 F.3d at 702.

> 1.   *Determination that Rehabilitation is not Prudent*

Traditionally, "[a]n alternative is not feasible if it cannot be built as a matter of sound engineering judgment." 23 C.F.R. § 774.17; *see also Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 411 (1971). An alternative is not prudent if:

> (i) It compromises the project to a degree that it is unreasonable to proceed with the project in light of its stated purpose and need;
> (ii) It results in unacceptable safety or operational problems;
> (iii) After reasonable mitigation, it still causes:
> > (A) Severe social, economic, or environmental impacts;
> > (B) Severe disruption to established communities;
> > (C) Severe disproportionate impacts to minority or low income populations; or
> > (D) Severe impacts to environmental resources protected under other Federal statutes;
> (iv) It results in additional construction, maintenance, or operational costs of an extraordinary magnitude;
> (v) It causes other unique problems or unusual factors; or
> (vi) It involves multiple factors in paragraphs (3)(i) through (3)(v) of this definition, that while individually minor, cumulatively cause unique problems or impacts of extraordinary magnitude.

23 C.F.R. § 774.17.

> As our court of appeals has explained:

> Under Section 4(f)(1), an alternative is not a prudent alternative if there are truly unusual factors present, if the cost or community disruption resulting from the alternative reaches extraordinary magnitudes, or if the alternative presents unique problems. *See Overton Park*, 401 U.S. at 413, 91 S. Ct. 814. We believe that we should apply a similar "feasible and prudent" determination to the world of alternatives that must be considered under 4(f)(2). *See Louisiana Envtl. Soc'y*, 537 F.2d at 86 ("Although there is no express feasible and prudent exception to subsection (2), the act clearly implies that one is present.").

*Concerned Citizens All.*, 176 F.3d at 702.

The standard under Section 4(f)(2) for eliminating alternatives need not be as high as that under Section 4(f)(1), "since by the time 4(f)(2) is reached, some historically significant property will necessarily be used, as is the case here." *Id.* Accordingly, "the Secretary must consider every 'feasible and prudent' alternative that uses historically significant land when deciding which alternative will minimize harm, but [] the Secretary has slightly greater leeway—compared to a 4(f)(1) inquiry—in using its expertise as a federal agency to decide what the world of feasible and prudent alternatives should be under 4(f)(2)." *Id.* at 702–03.

In moving for summary judgment, Defendants argue that they evaluated two rehabilitation alternatives—Alternative 3 (one-lane rehabilitation) and Alternative 4 (two-lane rehabilitation)—and determined neither was prudent. Therefore, they argue, Section 4(f) cannot compel selection of either of these alternatives.

With regard to Alternative 3, the Final Section 4(f) Evaluation concluded that both PennDOT's Design Manual Part 2 and standards from the American Association of State Highway and Transportation Officials do not permit a bridge width of less than 24 feet from curb to curb on a roadway like the Bridge. This conclusion was supported by a Bridge Width Evaluation memo prepared by Urban Engineers, and FHWA agreed with the determination that the one-lane replacement's failure to meet these design criteria rendered it imprudent because it was unable to meet the Project's purpose and need. In addition to these findings, the Section 4(f) Evaluation noted that Alternative 3 would not accommodate the largest emergency service vehicle or address sight distance and horizontal curve radius issues with the western approach. Furthermore, the Evaluation concluded that Alternative 3 may result in the Bridge still requiring a posted weight limit, in turn failing to meet the structurally deficient need.

Turning to Alternative 4, the Final Section 4(f) Evaluation determined that such a rehabilitation would also not be prudent. The Evaluation concluded that even though the piers and abutments would be reconstructed, the original piers, which were not designed to carry modern loads, would remain, and the stone masonry in their lower portions would be susceptible to continued mechanical weathering. These conditions resulted in a finding that Alternative 4 did not fully address the structurally deficient Project need. The two-lane rehabilitation would also have a width less than 24 feet curb-to-curb, failing to meet the functionally obsolete need like Alternative 3. And finally, Alternative 4 was found to not completely address the Project need of safely and effectively accommodating emergency response vehicles, because a turning radius study found that the largest Tinicum Township firetruck would still need to make two turn movements and veer into oncoming traffic.

Plaintiffs dispute all of these conclusions and maintain that rehabilitating the Bridge is a feasible and prudent alternative.

First, Plaintiffs contend that PennDOT already found that rehabilitation was acceptable because the agency agreed to rehabilitate the Bridge if Tinicum Township would accept ownership of the Bridge and responsibility for its maintenance.

Second, Plaintiffs assert that Defendants' reliance on guidelines from PennDOT itself and the American Association of State Highway and Transportation Officials is misplaced. They argue that both guidelines are not rigid rules or fixed standards, and flexibility in applying those guidelines is expected and necessary. Therefore, in Plaintiffs' eyes, a failure to meet these standards is not a sufficient reason to find rehabilitation imprudent.

Third, Plaintiffs claim that rehabilitating the Bridge would not result in unacceptable safety issues. They argue that it is not reasonable to believe PennDOT would agree to rehabilitate the

Bridge if the Township took ownership if such a rehabilitation would be unsafe. Plaintiffs also claim that the record shows that there are no safety issues related to the current width of the Bridge, and a single lane is actually the safer option. In support of this argument, Plaintiffs dedicate pages of their briefing to "a detailed review" of various traffic accidents supposedly associated with the Bridge. *See* Pls.' Mot. for Summ. J. 65–70.

Finally, Plaintiffs argue that there are not unacceptable operational problems associated with rehabilitating the Bridge. Again, Plaintiffs contend that PennDOT's agreement to rehabilitate the Bridge demonstrates that any supposed problems are, in fact, not "unacceptable." Plaintiffs also claim that no such problems exist. Although PennDOT found that the existing Bridge cannot safely and effectively accommodate traffic needs, including emergency response vehicles, Plaintiffs say that they provided numerous expert reports specifically refuting this claim. They also cite an expert literature review for the proposition that a one-lane bridge would be safer, and they claim that Defendants' determination that average daily traffic counts are too high for a one-lane Bridge are dependent on flexible American Association of State Highway and Transportation Officials standards and based on "highly questionable" data. Pls.' Mot. for Summ. J. 72–73.

In addressing the parties' arguments, the Court emphasizes that the question before it is not whether, in evaluating all the evidence presented in the administrative record, the Court would have made a different or even "better" decision than the agencies. The Court's job is most definitely not to re-try the administrative proceedings, gauge the efficacy of the dueling experts, re-calculate turning radii for firetrucks, re-construct traffic accidents or any of the tasks demanded of the agencies. The question is whether Defendants' decisions were arbitrary and capricious for failing to consider the appropriate, Congressionally intended factors. The Court concludes that they were not.

To begin, a reference to the analysis in *River Fields, Inc. v. Peters*, No. 08-264, 2009 WL 2222901 (W.D. Ky. July 23, 2009), is instructive, given how familiar the issues seem when compared to the case here. There, FHWA had approved a categorical exclusion and programmatic Section 4(f) evaluation for a project that would widen an historic one-lane bridge to two lanes. 2009 WL 2222901, at *1. The bridge was eligible for inclusion in the National Register both on its own merit and as a contributing element to the River Road Historic District. *Id.* The project also called for partial takings of two adjacent properties that were individually listed in the National Register. *Id.*

Challenging FHWA's Section 4(f) determination, the plaintiffs in *River Fields* argued that FHWA had failed to consider a reasonable one-lane bridge alternative to the two-lane widening. *Id.* at *8. The plaintiffs claimed that FHWA rejected the one-lane alternative "solely on Defendants' unfounded assertion that one-lane bridges are inherently unsafe." *Id.* They argued that "Defendants' own traffic accident information for the Bridge belies the contention that one-lane bridges are unsafe" and that "Defendants' data shows that traffic accidents on the Bridge have not only been historically few and far between but minor." *Id.* The plaintiffs also asserted that "Defendants' own consultant report supports the one-lane rehabilitation option." *Id.*

The court rejected the plaintiffs' contentions, reasoning:

> One-lane bridges may not be inherently unsafe and traffic control devices may improve safety on them. However, the issue here is not, as Plaintiffs suggest, "whether an acceptable degree of public safety on a one-lane bridge can be achieved utilizing measures such as lane marking, signage, lighting and traffic control devices." Plaintiffs' Memorandum in Opposition and Reply to Defendants' Motion for Summary Judgment, p. 12. The only issue here is whether the FHWA abused its discretion by finding that a one-lane rehabilitation of the Harrods Creek Bridge was not a reasonable alternative to the Project. The court concludes that the FHWA did not abuse its discretion in so finding.

*Id.* at *9.

Similarly, Plaintiffs here ask the Court to conclude that Defendants abused their discretion in determining that the rehabilitation alternatives were not prudent.  But like the defendants in *River Fields*, Defendants have provided multiple justifications for rejecting Plaintiffs' preferred alternatives, including rehabilitation's failure to meet industry standards, to accommodate emergency response vehicles, and to fully support modern loads.  Plaintiffs attack all of these conclusions, but like the plaintiffs in *River Fields*, these attacks are not successful because Defendants' determinations were supported by multiple studies and sources in support.  There may be evidence to the contrary, but "[a]n agency is entitled to select any reasonable methodology and to resolve conflicts in expert opinion and studies in its best reasoned judgment based on the evidence before it."  *Buckingham Twp.*, 157 F. Supp. 2d at 467 (citations omitted), *aff'd*, 27 F. App'x 87 (3d Cir. 2002); *see also Marsh*, 490 U.S. at 378 ("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive.").

Furthermore, Defendants concluded that the rehabilitation alternatives were not prudent for numerous reasons.  Even if each independent reason was not, on its own, enough to render the alternatives imprudent, "courts have held that an accumulation of smaller problems that, standing alone, would not individually constitute unique problems may together comprise sufficient reason for rejecting an alternative as imprudent."  *Concerned Citizens All.*, 176 F.3d at 704 (listing cases); *see also Comm. to Pres. Boomer Lake Park v. Dep't of Transp.*, 4 F.3d 1543, 1550 (10th Cir. 1993) ("Although none of these factors alone is clearly sufficient justification to reject the alternatives in this case, their cumulative weight is sufficient to support the Secretary's decision."); *Hickory Neighborhood Def. League v. Skinner*, 910 F.2d 159, 163 (4th Cir. 1990) ("A cumulation of small problems may add up to a sufficient reason to use § 4(f) lands.") (quoting *Eagle Found., Inc. v.*

*Dole*, 813 F.2d 798, 805 (7th Cir. 1987)).  The whole of the matter may indeed be of greater significance than the sum of the individual parts.

In light of the evaluations and evidence relied on by Defendants, and noting that the Third Circuit Court of Appeals has stated that the standard under Section 4(f)(2) for eliminating alternatives need not be as high as that under Section 4(f)(1), the Court concludes that Defendants were not arbitrary or capricious in determining that the rehabilitation alternatives were not prudent. *See Prairie Band Pottawatomie Nation v. Fed. Highway Admin.*, 684 F.3d 1002, 1022 (10th Cir. 2012) (stating that "[a] section 4(f) analysis, like an environmental impact statement, need not be flawless," and explaining that the FHWA's failure to consider even a "material fact" is insufficient to render the Secretary's decision arbitrary and capricious where "FHWA provided sufficient justification to conclude that alternatives to the selected route were imprudent").

### 2.   *Determination of Least Overall Harm*

Plaintiffs also argue that approving the Final Section 4(f) Evaluation was arbitrary and capricious because the two-lane replacement does not result in the least overall harm to Section 4(f) properties.  Rather, Plaintiffs claim that rehabilitation would result in the least overall harm because it will preserve the Bridge, which they contest is a Section 4(f) resource.

As outlined above, if there is not a prudent and feasible alternative that will completely avoid the use of historic properties, then the Project must include "all possible planning to minimize harm to such park, recreational area, wildlife and waterfowl refuge, or historic site resulting from such use."  23 U.S.C. § 138(a).  However, "an alternative that minimizes harm under Section 4(f)(2) can still be rejected if that alternative is infeasible or imprudent."  *Concerned Citizens All.*, 176 F.3d 686, 702 (3d Cir. 1999).

The Court has ruled that Defendants did not act arbitrarily or capriciously in concluding that the rehabilitation alternatives were not imprudent.  It is irrelevant whether the rehabilitation alternatives would cause less harm to Section 4(f) resources because Defendants were not legally required to carry them forward into the least overall harm analysis.  *See Hickory Neighborhood Def. League*, 893 F.2d at 62 ("[W]e hold that if the Secretary rejects an alternative as imprudent, he need not balance the impact on section 4(f) land from that alternative against the impact from the proposed project.").  Once Defendants determined that the rehabilitation alternatives were not prudent, those alternatives ceased to be part of the equation.

Furthermore, even if rehabilitation were a reasonable and prudent alternative, the Bridge is not the only property effected by the Project, and the alternative that causes the least harm to the Bridge may not necessarily cause the least harm to Section 4(f) properties overall.  Indeed, Defendants argue that replacement is preferred even when its attendant harms are weighed against the harms of rehabilitation because, "[l]ooking at the ability of the alternatives to meet the project need, the benefits to Tinicum Creek, the ability to mitigate the adverse impacts to the Historic District, and the views of the [Pennsylvania Historical and Museum Commission] and ACHP the officials with jurisdiction over historic resources, the two-lane replacement on the existing alignment results in the overall least harm."  PennDOT Mot. for Summ. J. 35.

"The Section 4(f)(2) balancing process 'permits the Secretary to engage in a broad consideration of the 'relative harm' arising from various alternates [sic].'"  *Concerned Citizens All.*, 176 F.3d at 694 (alteration in original) (quoting *Coal. on Sensible Transp. Inc. v. Dole*, 642 F. Supp. 573, 603 (D.D.C. 1986), *aff'd*, 826 F.2d 60 (D.C. Cir. 1987)); *see also Coal. on Sensible Transp.*, 642 F. Supp. at 603 ("The Secretary may weigh detrimental visual and aesthetic effects against direct physical encroachment upon protected parkland.") (citing *Louisiana Envtl. Soc., Inc.*

*v. Dole*, 707 F.2d 116, 121–22 (5th Cir. 1983)).  Defendants had great discretion in evaluating and weighing the relative harms associated with each alternative.[24]

Defendants also did not err by considering the impacts to the entire project area and the Historic District as a whole.  In *Concerned Citizens Alliance, Inc. v. Slater*, 176 F.3d 686 (3d Cir. 1999), our court of appeals considered an administrative challenge under Section 4(f)(2) against FHWA and PennDOT regarding their selection of a bridge replacement alternative that would send traffic through the Danville Historic District.  One of the "critical issues" the court considered was "whether the defendants acted arbitrarily in concluding that the Factory Street Underpass alternative would inflict the least amount of harm on the Historic District."  *Concerned Citizens All.*, 176 F.3d at 690.

In "review[ing] for abuse of discretion the Secretary's decision that the FSU alternative would do the least harm to Section 4(f) resources," *id.* at 695, the court confronted the plaintiffs' disagreement with "the fact that the defendants calculated the square footage of the two historic structures to be relocated or destroyed (one under the FSU alternative and one under the MS alternative) and compared the footage when arguing that the FSU alternative was preferable," *id.* at 700.

The court held:

[T]he administrative record supports the FHWA's finding that the FSU alternative will minimize harm *to the Danville Historic District*.  Even if we were to conclude that the MS and FSU alternatives would impose a comparable amount of harm *to Danville's Historic District*, we would be bound to uphold the Secretary's decision. These decisions are vested by law not in unelected judges but in the accountable Secretary.  *See Druid Hills*, 772 F.2d at 716 ("The Secretary is free to choose among alternatives which cause substantially equal damage to parks or historic sites.").  The defendants performed a large number of studies on the various ways in which the alternatives would impact *the Historic District* and adequately weighed the results of the studies in selecting the preferred alternative.  They also considered

---

[24]   The Court again emphasizes that the harms of rehabilitation need not have even been considered once it was determined rehabilitation was not prudent.

the more intangible benefits and harms to Mill and Factory Streets under the competing alternatives. As the foregoing discussion demonstrates, they considered and responded to the comments of the ACHP. Therefore, they did not violate Section 106. And as that discussion also demonstrates, it was not arbitrary and capricious for the FHWA to select the FSU alternative under Section 4(f)(2).

*Id.* at 702 (emphasis added).

Here, Defendants took many of the same measures embraced by the court in *Concerned Citizens Alliance*. Defendants considered both total avoidance alternatives and multiple other alternatives, including rehabilitation. During the evaluation of all alternatives, they treated the Bridge as a Section 4(f) property and noted any impacts to the Bridge in their analysis. They relied on studies and additional resources in determining that the two-lane replacement was the only prudent and feasible alternative. In coordination with the ACHP and the PaSHPO, and with input from the Section 106 consulting parties, Defendants evaluated how to minimize the harms to historic properties caused by the Project. That mitigation evaluation resulted in a signed Memorandum of Agreement between Defendants, the ACHP, and the PaSHPO stating that the two-lane replacement alternative was the preferred alternative and the mitigation measures adequately addressed the harms. In light of the Third Circuit Court of Appeals approving a Section 4(f) evaluation where the selection of an alternative was framed in terms of the harm to the historic district, even where the chosen alternative would involve the destruction of a contributing resource to the historic district, the Court concludes that Defendants did not err in framing the analysis to focus on the harm to the Historic District.

However, Plaintiffs' disagreements do not end there. Plaintiffs also claim that the least overall harm analysis was fatally flawed because once the preferred alternative was selected, the mitigation efforts were focused on minimizing harms to the Historic District and failed to mitigate the impacts to the Bridge. They assert that the Bridge is a Section 4(f) property and must be afforded full protection, including "all possible planning to minimize harm." 23 U.S.C. § 138(a).

Defendants respond that they performed an appropriate mitigation analysis under Section 4(f) regardless of whether the Bridge is individually eligible or eligible only as a contributing property.

Plaintiffs demand a mitigation analysis centered on the Bridge rather than the Historic District.  However, such a demand overlooks that any efforts to minimize the harm to the Historic District must necessarily include efforts to minimize the harms to its contributing resources.  If all possible planning was taken to minimize harm to the District, then, by pure logic, all harm to its contributing resources, including the Bridge, must also have been minimized.[25]  That such mitigation was considered is apparent upon review of the record.  Although Plaintiffs would have the Court believe that no Bridge-specific mitigation occurred, the Memorandum of Agreement is full of specific stated measures to mitigate the impact to the Bridge, reuse portions of the original structure, and create an historically sensitive design for the two-lane replacement.[26]

Having reviewed this Bridge-specific mitigation and Defendants' representations that the mitigation already encompassed full consideration of the Bridge, it becomes apparent that requiring a "Bridge-focused" (as opposed to an "Historic District-focused") analysis would be an exercise only in semantics and would not have a substantive impact on the outcome of the Section 4(f) Evaluation.  Accordingly, there is no basis upon which to find Defendants' least overall harm analysis arbitrary or capricious or to remand on this issue.  *See KPMG, LLP v. S.E.C.*, 289 F.3d

---

[25]      Consider, for example, a person who reports for a routine well visit at the doctor's office.  If it is the doctor's task to ensure that the person, as a whole, is as healthy as possible, one would still necessarily expect an examination that evaluated individual aspects of the person's health, such as blood pressure, heart rate, and lung performance.  This is because a person can only be considered healthy by checking and treating the smaller, individual problems that arise.  So too, here, only by minimizing the harms to the individual aspects of the Historic District, such as the Bridge, could the harms to the Historic District have been mitigated to the fullest extent.  It follows that by performing all possible planning to mitigate the harms to the Historic District, Defendants necessarily also incorporated the possible planning to mitigate the harms to its contributing resources.

[26]      The Court has detailed these mitigation measures throughout this memorandum and need not repeat them here.

109, 126 (D.C. Cir. 2002) ("[C]onsistent with remanding only when we conclude that there is a significant chance that but for an error the agency might have reached a different result, we conclude that it would be meaningless to remand.") (citations and internal quotation marks omitted).

### C.     Whether Defendants Failed to Perform Mandatory Maintenance on the Bridge

Finally, Plaintiffs claim that PennDOT failed to maintain the Bridge in violation of 71 P.S. § 512(a)(8), a Pennsylvania law that requires PennDOT "[t]o mark, build, rebuild, relocate, fix the width of, construct, repair, and maintain State designated highways and transportation facilities and rights of way."  Plaintiffs argue that "PennDOT disregarded its maintenance obligations on the Bridge in the hopes that the agency could argue that the Bridge could not be rehabilitated and needed to be replaced."  Compl. ¶¶ 161–62.  By suggesting either deliberate or neglectful "sabotage," Plaintiffs ask the Court to find that this failure to perform necessary maintenance was arbitrary, capricious, or otherwise not in accordance with law.

PennDOT moves for summary judgment on the basis that the Court does not have subject matter jurisdiction to hear this claim.  First, PennDOT argues that Plaintiffs have not addressed the issue of supplemental jurisdiction under 28 U.S.C. § 1367.  Second, PennDOT asserts that federal courts should not interpret the police power given to PennDOT by the Pennsylvania legislature.  PennDOT represents that Plaintiffs' claim raises a novel issue of state law because there are no state appellate court decisions interpreting PennDOT's state police power, supporting dismissal.  *See* 28 U.S.C. § 1367(c)(1) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if the claim raises a novel or complex issue of State law . . . .").

FHWA argues that the appropriate remedy for Plaintiffs' failure to maintain claim is a mandamus action in state court, not a federal review under the Administrative Procedure Act.

Plaintiffs have not responded to Defendants' arguments or briefed the failure to maintain claim in their summary judgment papers.  When asked at oral argument on the motions for summary judgment whether Plaintiffs intended to pursue this claim, Plaintiffs' counsel responded, "[W]e didn't brief the state law claim in the context of the summary judgment motions, so we don't believe that's something for the Court to consider at this point.  . . .  [W]e're not inviting Your Honor to tread there."  Nov. 1, 2019 Oral Arg. Tr. 20:10–16.

Plaintiffs have not provided any support, legal or otherwise, for their contention that the Court should not address the failure to maintain claim at this time when Defendants have moved for its dismissal and briefed the issues.  But the Court will not reach the merits at this time, or at any time for that matter, because the Court declines to exercise supplemental jurisdiction over this claim.  In ruling on the present motions for summary judgment, the Court has resolved all of the claims over which it has original jurisdiction.  The Court will therefore abstain from reaching the complex issues of state law raised in Plaintiffs' lone, possibly remaining claim.  *See* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if the district court has dismissed all claims over which it has original jurisdiction . . . ."); *see also Riverfront Garden Dist. Ass'n, Inc. v. City of New Orleans*, No. 00-544, 2000 WL 35801851, at *12 (E.D. La. Dec. 11, 2000) (dismissing state law claims pursuant to 28 U.S.C. § 1367(c)(3) after granting summary judgment on federal claims arising under NEPA, Section 4(f), and the National Historic Preservation Act).

## CONCLUSION

For the foregoing reasons detailing the limits on the Court's powers in this dispute, the Court denies Plaintiffs' motion for summary judgment and grants Defendants' motions for summary judgment. An appropriate order follows.

BY THE COURT:

**GENE E.K. PRATTER**
UNITED STATES DISTRICT JUDGE